D. J. JORDEN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 13704, 13735.   Promulgated November 30, 1948.

*Charles H. Davis, Esq.*, for the petitioner.
*Harold H. Hart, Esq.*, for the respondent.

ARUNDELL, *Judge*: The proceeding under Docket No. 13704 involves a deficiency in the petitioner's income tax for the calendar year 1941 in the amount of $73,574.03, and a deficiency in income and victory taxes for the calendar year 1943 in the amount of $84,834.86.

The proceeding under Docket No. 13735 involves deficiencies in income, declared value excess profits, and excess profits taxes determined against the petitioner as a fiduciary for the Bemidji Wood Products Co. for the taxable years ended December 31, 1941 and 1942. The deficiencies in income tax determined for 1941 and 1942 are $10,490.07 and $3,111.38, respectively. Respondent has determined a deficiency in declared value excess profits tax for 1941 in the amount of $813.93 and a deficiency in excess profits tax for 1941 in the amount of $5,429.63.

The first issue is whether the value of a demand note and all of the issued capital stock of Bemidji Wood Products Co. which were received by petitioner in 1941, and cash and property in excess of that value distributed to him in 1942 upon the liquidation of the company, constituted ordinary income under section 22 (a) in those years, or whether the total value of the assets received by him in 1942 is taxable as a long term capital gain within the meaning of section 117 of the Internal Revenue Code, as being in payment for the stock held by petitioner in Bemidji, or whether such assets were paid to petitioner in liquidation of Bemidji's indebtedness to him.

The second issue herein relates to the petitioner's liability as a trustee in dissolution for Bemidji Wood Products Co. for deficiencies determined against that company in income, declared value excess profits, and excess profits taxes for the years ended December 31, 1941 and 1942. Petitioner has conceded his liability as a fiduciary for any deficiencies as are found to exist. Bemidji's liability for these deficiencies rests upon the question of whether it may properly include, in computing its net operating loss deductions for the years 1941 and 1942, its net operating losses for the years 1939 and 1940 where it appears that for two taxable periods in 1940 Bemidji reported its income on a consolidated return with two different parent companies. It also remains to be decided whether, in computing its net income for 1941, the interest accrued and not paid by Bemidji in that year is deductible in view of the provisions of section 24 (c) of the Internal Revenue Code.

### FINDINGS OF FACT.

The petitioner, D. J. Jorden, is an individual, residing at the Lakeshore Hotel, Cleveland, Ohio. His income tax returns for the calendar years 1941 and 1942 were filed with the collector of internal revenue

for the district of Minnesota and his income and victory tax return for the calendar year 1943 was filed with the collector for the tenth and eighteenth collection districts of Ohio.

The Bemidji Wood Products Co., hereinafter referred to as Bemidji, is a Minnesota corporation engaged in making boxes and other wood products. Its books were kept on the accrual basis and its tax returns filed for the calendar years 1941 and 1942 with the collector of internal revenue for the district of Minnesota.

The petitioner was retained by the Utilities Light & Power Corporation in October 1937 to manage the affairs of Bemidji. Shortly thereafter he became a director of Bemidji and was made its president. The Utilities Corporation, from November 1932 until some time in 1940, owned all of the outstanding stock of Bemidji except for the directors' qualifying shares.

Bemidji consistently lost money and from time to time called upon the parent company for funds. In consideration of these advances, Bemidji on February 1, 1935, gave the Utilities Power & Light Corporation a demand promissory note for $621,000, which bore interest at the rate of 6 per cent per annum. In 1940 this note came into the possession of the Ogden Corporation, along with all of the stock of Bemidji except the directors' qualifying shares. As of September 30, 1940, there was due from Bemidji on the note $621,000 of principal, plus $158,090 in interest.

A contract was signed on October 15, 1940, by the Ogden Corporation, Bemidji, and the petitioner by which the Ogden Corporation agreed to sell to the petitioner and the petitioner agreed to purchase from Ogden all of the outstanding shares of the capital stock of Bemidji and the 6 per cent demand note in consideration of the payment to Ogden of the sum of $145,500. Payment for the stock and the note was agreed to be made in the following manner: $80,500 was to be paid on October 15, 1940, by Bemidji; $20,000 was to be paid by Bemidji within 120 days after that date, and $45,000 was to be paid by D. J. Jorden within a period of three years from October 15, 1940. This $45,000 was to bear interest at the rate of 5 per cent per annum, payable monthly. Delivery of the note and stock to the petitioner was to be made upon the completion of all payments.

The contract authorized Bemidji to enter into negotiations for a loan of approximately $85,000. From the proceeds of this loan and from assets on hand, Bemidji was to pay to the Ogden Corporation by October 15, 1940, a total of $80,500. The agreement with the lenders was to provide that the loans should be secured by such assets of Bemidji as the lenders and Bemidji might determine and that the Ogden Corporation was to be under no obligation or liability whatsoever to the lenders for the repayment of such a loan.

Bemidji mortgaged its inventory to secure loans from the banks and the money so obtained, together with other money in its possession, was paid to Ogden under this contract. The notes given by Bemidji were signed by both the company and the petitioner individually.

Bemidji from its own funds paid to the Ogden Corporation $145,500 and the note and stock of Bemidji were delivered to the petitioner on or about July 22, 1941. No payments upon the principal indebtedness under the contract of purchase were made by the petitioner. The payments made by Bemidji to the Ogden Corporation were as follows:

| | | | |
|---|---|---|---|
| Oct. 1940 | $80,500 | July 1941 | $11,000 |
| Dec. 1940 | 5,000 | July 1941 | 34,000 |
| Dec. 1940 | 5,000 | | |
| Jan. 1941 | 5,000 | Total | 145,500 |
| Feb. 1941 | 5,000 | | |

These payments were debited on Bemidji's books to an account designated "floating debt," which contained all entries relative to the principal due on that note. The balance of principal due was reduced by these payments from $621,000 to $475,500.

A letter dated December 16, 1942, from the petitioner to the firm of Ernst & Ernst, auditors for Bemidji, reads in part as follows:

As stated to you by telephone this afternoon, it would be well to get the opinion of an Attorney as to the legality of liquidation at this time. The suits pending in the wage and hour matter will be put on the January calendar. When they will be set for trial I do not know. We do not think there is any likelihood of the plaintiffs recovering anything in these suits, however, there is always the possibility of judgments against us. If judgment should be obtained, it would be well to have the large note that I hold against the Company, which would largely absorb the assets, if all claims were settled in proportion to their respective amounts. Of course, if we liquidate now, and we no doubt should, the note would be out of existence at the time of the trial of the suits. These are merely thoughts to keep in mind while we are planning liquidation.

At a special meeting of the stockholders of Bemidji held on December 21, 1942, it was resolved to dissolve the corporation. The petitioner was appointed trustee and was authorized to take charge of all the assets of the corporation, to collect all sums due and owing to it, and to discharge all of its debts and liabilities according to their respective priorities, and thereafter to divide the remainder of the assets of the corporation among the shareholders *pro rata* in accordance with their holdings of stock.

Bemidji paid off all of the corporate obligations other than the note which was held by petitioner. Thereafter, he received corporate assets having a market value of $152,515.51. The certificate of dissolution was then filed with the proper state authorities.

The books of Bemidji Wood Products Co. show that the amounts distributed to the petitioner upon its dissolution were treated as partial payments upon the principal of the note. The entries in the general ledger account of Bemidji on December 24, 1942, recorded the distribution in the following manner:

| | | | |
|---|---|---|---:|
| 12/24/42 | Cash receipts (D. J. Jorden) | GJ163 | $7, 815. 33 |
| " | Final disbursements on Cleveland Trust Co. a/c—To D. J. Jorden on note | GJ164 | 47, 346. 19 |
| " | Final disbursements to D. J. Jorden on note from these accounts: | | |
| | Central National Bank | GJ164 | 33, 648. 95 |
| | Northern National Bank | | 396. 90 |
| | First National Bank | | 30. 99 |
| | First National Bank—petty cash | | 250. 51 |
| | Northern National Bank—P/R a/c | | 500. 00 |
| " | To record distribution of remaining assets to D. J. Jorden on payment of note | GJ168 | 67, 072. 39 |
| " | To close unpaid liability and net worth accounts there being no remaining assets for distribution | GJ169 | 318, 438. 74 |

These books indicate that no distribution was made in respect to the capital stock. The balance sheets of Bemidji as of December 31, 1939, 1940, and 1941 and the book statement as of June 30, 1941, show that the capital stock account was at all times maintained at $10,000. These records also demonstrate that the corporation was insolvent throughout this entire period. The excess profits tax returns of Bemidji for the years 1940 and 1941 disclose that the 6 per cent demand note was included by that company in the determination of its borrowed invested capital.

Petitioner's 1941 individual income tax return, which was prepared on the cash basis, reported his salary from Bemidji as $12,225. The receipt by petitioner in that year of the note and stock of the company was not reported on this return. Petitioner's 1942 income tax return, which was also filed on the cash basis, reported a long term capital gain of $79,043.18, which was described as one-half of a reported gain of $158,086.36 realized upon the liquidation of Bemidji. Petitioner's 1943 return reported income of $265.69, attributed to additional proceeds from the liquidation of Bemidji in the amount of $531.38 which petitioner treated as a long term capital gain. The deficiency based on petitioner's 1942 income was determined for 1943 due to the forgiveness feature of the Current Tax Payment Act of 1943.

In the deficiency notice in Docket No. 13704, respondent explained the adjustments to petitioner's income for the years ended December 31, 1941, and December 31, 1942, as follows:

During the year 1941 you acquired the 6 percent demand note of Bemidji Wood Products Company in the unpaid amount of $475,500.00, together with all of the issued stock of said corporation, consisting of 100 shares of no par

value, as compensation for services. It is held that said note had a value when received of $121,855.63 and that the stock had no value. It is further held that said note and stock so received by you constitutes ordinary income for the year 1941 in the amount of $121,855.63.

\* \* \* \* \* \* \*

(a) During the year 1942 Bemidji Wood Products Company liquidated and dissolved. Prior to said liquidation and dissolution you received cash and property of a total value of $158,617.74 in full and complete payment of the 6 percent demand note of said corporation in the unpaid balance of $475,500.00, which note you acquired at no cost to you. Accordingly, it is held that the entire amount received by you in payment of said note, or $158,617.74, constitutes ordinary income for the year 1942.

(b) On line 7 (b) of your return you reported a net long term capital gain in the amount of $79,043.18 on account of the receipt of distributive assets in the liquidation of Bemidji Wood Products Company. It is determined that the receipt of such assets does not constitute a long term capital gain.

OPINION.

In the proceeding in Docket No. 13704, petitioner seeks a redetermination of the deficiencies found in income tax for the calendar year 1941 and income and victory taxes for the calendar year 1943. The latter deficiency is based principally upon petitioner's 1942 income, but, due to the provisions of the Current Tax Payment Act of 1943, was determined for 1943.

Respondent has increased petitioner's taxable income for 1941 by the amount of $121,855.63, which respondent has determined to be the value of the Bemidji note and capital stock received by petitioner in that year, upon the basis that these assets were received by petitioner as additional compensation for services rendered by him to Bemidji as its manager in 1941. Respondent also contends that the amount by which the assets received by petitioner upon the liquidation of Bemidji in 1942 exceeded the sum of $121,855.63 is taxable to him as ordinary income for 1942. In the alternative, the respondent contends that the entire sum received by petitioner in 1942 when Bemidji's affairs were wound up constituted ordinary income to petitioner in the nature of payment received by him on Bemidji's note, which had cost petitioner nothing. Respondent concedes a duplication in his determination in that while proposing to tax $121,855.63 as income in 1941, he also includes the full sum received on liquidation in the year 1942.

Bemidji had been insolvent at all times from 1935, when it issued the six per cent demand note for $621,000 to the Utilities Power & Light Corporation, until it was liquidated in December 1942. It appears that the Ogden Corporation, which acquired both the note and stock of Bemidji from the Utilities Corporation in April 1940, was engaged in the business of purchasing and salvaging the assets of insolvent or bankrupt corporations. The contract of October 15, 1940, between

Ogden, Bemidji, and the petitioner suggests that Ogden's only motive in entering into the agreement was to realize a reasonable profit on the Bemidji note and capital stock it had recently acquired.

The agreement states that the Ogden Corporation agreed to sell to petitioner and that the petitioner agreed to purchase from Ogden the capital stock and note of Bemidji. Bemidji was granted the right under this agreement to pledge its inventory or other assets as security for loans to enable it to make the initial payment of $80,500.

Thereafter, Bemidji borrowed large sums from the banks and pledged its inventory as security for these loans. The notes given by Bemidji carried the endorsement of the petitioner. With the money so borrowed and other funds in its possession, Bemidji had paid by July 1941 the full amount of $145,500, which included not only the sum it expressly agreed to pay under the contract, but also the sum petitioner had agreed to pay thereunder. These payments served to reduce the principal indebtedness of Bemidji from $621,000 to $475,500. Pursuant to the terms of the contract, Ogden then transferred to petitioner all of the outstanding stock and the note of Bemidji.

While the contract in question was, in form, one in which the petitioner, Bemidji, and Ogden were parties, it seems clear to us that the substance of the contract was that Ogden agreed to sell the note and stock to petitioner, provided the latter would pay or see to the paying of $145,500. Petitioner was free to use the assets of Bemidji in raising the money to make this payment to Ogden. The contract by its terms characterizes the transaction as a sale by Ogden to petitioner, and we are disposed to treat the transaction in that manner. In our opinion, there is no basis for regarding the transfer of the note and shares as in the nature of compensation to the petitioner. Jorden was an officer and employee of Bemidji and at no time was he in the employ of Ogden.

In view of our interpretation of this transaction, it follows that the petitioner received no income in 1941 by virtue of his purchase from Ogden of the note and stock of Bemidji and, consequently, respondent's determination that the value of the note and stock constituted additional compensation received by petitioner from Bemidji is in error.

It is the petitioner's contention that the value of cash and property received by him upon the liquidation of Bemidji in 1942, which has been stipulated to have been $152,515.51, may properly be reported by him as a long term capital gain. Petitioner relies upon the provisions of section 115 (c) of the Internal Revenue Code,[1] which pro-

---

[1] SEC. 115. DISTRIBUTIONS BY CORPORATIONS.

    &ast;        &ast;        &ast;        &ast;        &ast;        &ast;        &ast;

(c) DISTRIBUTION IN LIQUIDATION.—Amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock, and amounts

vides that amounts distributed in complete or partial liquidation of a corporation shall be treated as in full payment or partial payment in exchange for the stock. However, in our opinion, this section leaves the issue of whether assets distributed to a creditor-stockholder upon the liquidation of a corporation are made in exchange for the stock or upon the indebtedness as a question of fact, to be determined in each case from the circumstances surrounding the payment.

Petitioner argues that he "had the right to apply the assets received by him upon the liquidation of the corporation in such manner as he saw fit," and that he elected to treat the distribution received by him as a liquidation in respect to the stock which he held in the corporation rather than in payment of the note which he then held. With this line of reasoning we can not agree.

We have found herein that Bemidji Wood Products Co. was insolvent at the time of its liquidation in December 1942. Upon the dissolution of an insolvent corporation, corporate assets are, as a general rule, appropriated first for the payment of creditors. This rule is stated in Corpus Juris Secundum, vol. 19, sec. 1560, as follows:

It is a rule of general application that as between creditors and stockholders the property of an insolvent corporation is first appropriated to the payment of its creditors. In other words, until all of the debts of the corporation have been paid, no part of the property of the corporation shall go to reimburse the principal of capital stock. Any device which seeks to arrange matters so that a part of the principal of the stock might be withdrawn before the full discharge of all corporate debts is contrary to the nature of capital stock, opposed to public policy, and void as to creditors affected thereby, and this principle applies as well to unsecured as to secured creditors.

This rule was recognized and applied in *Harriet Aldrich*, 1 T. C. 602, which case, in our opinion, is determinative of the issue herein. The Court in the *Aldrich* case stated:

\* \* \* The creditors had a prior claim on the corporation's assets and normally the claims should be paid before a distribution is made to the shareholders; especially since, as was known to the officers and directors, the assets were less than adequate for the discharge of the debt. This deliberate and normal conduct is not susceptible of characterization as a liquidation distribution to shareholders either by rationalization or reference to any evidence of a liquidation distribution.

The resolution of December 21, 1942, which appointed the petitioner as trustee in dissolution for Bemidji, also states that he was to pay off and discharge all of its debts, liabilities, and obligations according to their respective priorities and that after fully discharging all such debts, liabilities, and obligations he was to divide the

distributed in partial liquidation of a corporation shall be treated as in part or full payment in exchange for the stock. The gain or loss to the distributee resulting from such exchange shall be determined under section 111, but shall be recognized only to the extent provided in section 112. \* \* \*

remainder of the property and assets of the corporation among the shareholders, pro rata, in accordance with their several holdings of shares.

It is apparent from the facts in the instant case that petitioner made his "election" only after he realized the tax advantages of treating the distribution in respect to his stock rather than the note. There is no evidence that petitioner ever forgave or surrendered the note to Bemidji or waived his rights to enforce its collection prior to the distribution. The records of the corporation, which were under his sole direction and control, state that the amounts distributed to him were made as payments upon the note and not in exchange for the capital stock he held. Petitioner, in a letter to the firm of Ernst & Ernst, dated December 16, 1942, clearly shows that he regarded himself as a creditor of the corporation and planned to rely upon this indebtedness in the event Bemidji was liquidated.

Petitioner relies chiefly upon the case of *T. T. Word Supply Co.*, 41 B. T. A. 965. As this Court pointed out in *Harriet Aldrich, supra*, the case of *T. T. Word Supply Co.* did not consider the question as to whether the amount received by the shareholder was in payment of the corporation's debt to him or in liquidation of his shares. This distinction was indicated by the Court as follows:

The decision in *T. T. Word Supply Co.*, 41 B. T. A. 965, relied upon by petitioners, appears to be but is not really at variance with what is now held. No question was considered in that case as to whether the amount received by the shareholder was in payment of the corporation's debt to him, on the one hand, or in liquidation of his shares, on the other.

Petitioner also relies upon *Edward G. Janeway*, 2 T. C. 197, and associated cases which relate to the treatment of capital contributions made to a corporation by its stockholders. On this point, it suffices to say that the record shows that no capital was contributed to Bemidji by the petitioner, nor is there any evidence that he made a capital contribution by way of forgiving corporate indebtedness owing to him. On the contrary, he was careful to preserve his status as a creditor.

It is therefore our conclusion that $152,515.51, the value of the assets distributed to the petitioner upon liquidation of Bemidji in 1942, constituted payment upon the indebtedness evidenced by the demand note held by him rather than payment in exchange for the capital stock.

The law is clear that payment made upon a note by or on behalf of the maker in satisfaction of the maker's liability thereon does not constitute a sale or exchange of property within the meaning of section 117 of the Internal Revenue Code. *Hale* v. *Helvering*, 85 Fed. (2d) 819; *Felin* v. *Kyle*, 22 Fed. Supp. 556; *Lee* v. *Commissioner*, 119 Fed. (2d) 946. It therefore follows that the amount of $152,515.51 is taxable as ordinary income to the petitioner in the calendar year 1942.

Bemidji filed its income and excess profits tax returns for the taxable years in question on the accrual basis. In its income and excess profits tax return for 1939, it reported an adjusted net loss of $23,624.95. A deduction of "Interest on Notes to Parent Company" of $37,260 was claimed. Of this amount which was accrued on its books, $27,260 was never paid.

In its income, declared value excess profits, and defense tax return for 1940, Bemidji reported a deficit (in income) of $10,160.82. A deduction of $36,253.75 was claimed for "Interest on Notes to Affiliated Company." Of this accrued interest, $26,253.75 was never paid. For the period January 1 to April 2, 1940, Bemidji was affiliated with the Utilities Power & Light Corporation and $7,547.51 of the net loss of $10,160.82 shown on Bemidji's 1940 income tax return was reflected in the consolidated excess profits tax return filed by the Utilities Corporation for 1940. For the period April 3 to October 15, 1940, Bemidji claimed affiliation with the Ogden Corporation and $2,030.74 of the net loss of $10,160.82 for 1940 was reflected in the consolidated excess profits tax return filed by the Ogden Corporation in 1940. In a separate excess profits tax return filed by Bemidji for the period October 16 to December 31, 1940, $582.57 of the same net loss was reported.

Bemidji filed a final income and declared value excess profits tax return for 1941, reporting a net loss of $10,282.15. In computing its income for 1941 there was taken a net operating loss deduction in the amount of $34,089.77. A deduction was also taken for accrued interest in the amount of $20,147.78. Of this amount, $17,421.62 represented interest accrued on the note then held by petitioner, which interest was never paid. On line 24 of its 1941 excess profits tax return, an adjusted excess profits loss of $36,739.49 was reported.

Bemidji's 1942 income and declared value excess profits tax return reported a net income of $13,087.09. A net operating loss deduction of $10,282.15 was claimed, representing a claimed net loss carry-over from 1940 of $10,464.82.

In Docket No. 13735, respondent stated in his deficiency notice that Bemidji, in computing the net loss carry-overs from the years 1939 and 1940, which were in turn used to compute the net operating loss deduction taken on its 1941 return, included therein interest accrued but not paid in the amounts of $27,260 and $26,253.75 in the years 1939 and 1940, respectively. The basis of his disallowance of the net operating loss deduction for 1941 was that at the close of 1939 and 1940 there was no likelihood that the interest so accrued in those years would be paid and that no part thereof has since been paid and that

such interest deductions for that reason were not allowable. The same basis was cited by respondent for disallowing Bemidji's claim for a net operating loss deduction in the amount of $10,282.15 in its 1942 return.

Respondent also disallowed $17,421.62 of a deduction of $30,095 claimed by petitioner in 1941 for interest. This part of the interest was accrued but not paid during 1941 and respondent held that there was no likelihood that any part thereof would be paid. In the alternative, the respondent asserted that the interest so accrued was unallowable under the provisions of section 24 (c) of the Internal Revenue Code.

OPINION.

The issues in Docket No. 13735 relate to deficiencies determined in income, declared value excess profits, and excess profits taxes of Bemidji Wood Products Co. for the years ended December 31, 1941 and 1942. Petitioner has conceded his liability as a fiduciary for such deficiencies as may be determined in this proceeding.

The second issue for determination herein is whether, in computing its net operating loss carry-overs to the years 1941 and 1942, Bemidji was entitled to take into account certain net operating losses sustained in 1939 and 1940. Respondent has specifically disallowed $27,260 of a $37,260 deduction claimed by Bemidji for interest on "Notes to Parent Company" in 1939, and $26,253.75 of a $36,253.75 deduction taken for "Interest on Notes to Affiliated Company" in 1940. The amounts disallowed by respondent represent that portion of the interest accrued on Bemidji's books in each of the years that was not actually paid.

We have held that in order for interest to be accrued there must be a reasonable expectancy that the obligation will be discharged in the normal course of business. *Zimmerman Steel Co.*, 45 B. T. A. 1041, 1047. In *Zimmerman Steel Co.* v. *Commissioner*, 130 Fed. (2d) 1011, the Circuit Court of Appeals for the Eight Circuit reversed our decision in that case, stating:

* * * where interest actually accrues on a debt of a taxpayer in a tax year the statute plainly says he may deduct it. That he has no intention or expectation of paying it, but must go into bankruptcy as this taxpayer was obliged to do, can not of itself justify denial of deduction in computing the taxpayer's net income. It is true that if a man's gains at the end of the year consist of bad debts he can have no net income to tax. But neither does he have such net income if the interest on what he owes amounts to more than his gains.

The Commissioner, in I. T. 3635, C. B. 1944, p. 101, which was promulgated in 1944 after our decision in the *Zimmerman* case and its reversal in the Eighth Circuit, adopted the rule, which he urges on

brief, that interest on indebtedness may be accrued so long as the debt is not extinguished and "the doubt as to collectibility of such interest is not such a contingency as postpones the accrual of the liability until the contingency is resolved." As we understand the Commissioner's position, the fact that there may be doubt as to the payment of the interest by the debtor is not enough to deny the deduction, but the deduction may only be denied when the doubt is resolved by a determination that in no event will the interest be paid. In each of the years from 1939 to 1941 some part of the interest on Bemidji's obligation to the parent company was in fact paid, and as late as 1941 there was payment upon the principal of the note. In such circumstances, we do not feel that it could have been categorically said at the time these deductions were claimed that the interest would not be paid, even though the course of conduct of the parties indicated that the liklihood of payment of any part of the disallowed portion was extremely doubtful. On the facts of the case and in view of the Commissioner's position as expressed in I. T. 3635 and the further fact that this proceeding is appealable to the Circuit Court of Appeals for the Eighth Circuit, the court which reversed the opinion of this Court in the *Zimmerman* case, *supra*, we feel constrained to hold that the interest accrued on the indebtedness due to Bemidji's parent during 1939 and 1940 constituted proper deduction for income tax purposes.

For reasons which we hereinafter state, we are of the opinion that the interest on the indebtedness in the amount of $17,421.62 which Bemidji accrued but did not actually pay in 1941 and which it sought to deduct in computing its net income for 1941 is not an allowable deduction for income tax purposes. From and after July 22, 1941, all of the outstanding capital stock of Bemidji was owned by the petitioner. As the facts show that the $17,421.62 was not paid within the taxable year 1941 or within two and one-half months after the close thereof, and that petitioner prepared his individual income tax returns on the cash basis, it appears the interest in controversy was clearly not deductible under the provisions of section 24(c) of the Internal Revenue Code.[2]

Respondent claims that, irrespective of our ruling upon the deductibility of the interest accrued during 1939 and 1940 under the doc-

---

[2] SEC. 24. ITEMS NOT DEDUCTIBLE.

* * * * * * *

(c) UNPAID EXPENSES AND INTEREST.—In computing net income no deduction shall be allowed under section 23(a), relating to expenses incurred, or under section 23(b), relating to interest accrued—

(1) If such expenses or interest are not paid within the taxable year or within two and one half months after the close thereof ; and

(2) If, by reason of the method of accounting of the person to whom the payment is to be made, the amount thereof is not, unless paid, includible in the gross income of such.

trine of the *Zimmerman* case and the Commissioner's ruling in I. T. 3635, Bemidji is not entitled to a net operating loss deduction in 1941 because of the provisions of regulations respecting consolidated returns.

For the period January 1 to April 3, 1940, Bemidji was affiliated with the Utilities Power & Light Corporation, and $7,547.51 of the net loss of $10,160.82 shown on Bemidji's 1940 income tax return was reflected in a consolidated excess profits tax return filed by the Utilities Corporation for 1940. For the period April 3 to October 15, 1940, Bemidji claimed affiliation with the Ogden Corporation and $2,030.74 of the same net loss for 1940 was taken in a consolidated excess profits tax return filed by the Ogden Corporation in 1940. Bemidji filed a separate excess profits tax return for the period between October 16 and December 31, 1940, claiming the remainder of the net loss for 1940, or the amount of $582.57.

Section 730 of the Internal Revenue Code was applicable to the taxable year 1941. Regulations 110, section 33.31(d), promulgated pursuant to section 730, provided in part:

\* \* \* but no net operating loss sustained during a consolidated return period of an affiliated group shall be used in computing the net income of a subsidiary \* \* \* for any taxable year subsequent to the last consolidated return period of the group. No part of any net operating loss sustained by a corporation prior to a consolidated return period of an affiliated group of which such corporation becomes a subsidiary shall be used in computing the net income of such corporation for any taxable year subsequent to the consolidated return period \* \* \*.

It also appears that section 730 and Regulations 110 were applicable only in respect to the excess profits tax.

At no time between the years 1939 and 1942 was Bemidji's income included in a consolidated income tax return. It would seem, therefore, that section 730 and Regulations 110, section 33.31 (d), have no bearing upon Bemidji's income and declared value excess profits tax liability and that the net operating losses sustained in 1939 and 1940 may properly be brought forward for these purposes in 1941 and 1942.

As we have previously stated herein, a part of Bemidji's net operating loss for 1940 was included in the consolidated excess profits tax returns filed by the Utilities Power & Light Corporation and the Ogden Corporation in that year. Under our interpretation of Regulations 110, section 33.31 (d), *supra,* that portion of the net operating

person for the taxable year in which or with which the taxable year of the taxpayer ends; and

(3) If, at the close of the taxable year of the taxpayer or at any time within two and one half months thereafter, both the taxpayer and the person to whom the payment is to be made are persons between whom losses would be disallowed under section 24(b).

loss for 1940 which was sustained by Bemidji during the consolidated return periods can not be used in computing its excess profits tax net income for 1941, which was a taxable year subsequent to the last consolidated return period of the group. It would appear, however, that Bemidji was entitled to include in the computation of its excess profits tax net income for 1941 the amount of $582.57 which represents that portion of the net operating loss for 1940 which it reported in a separate excess profits tax return for the period October 16 to December 31, 1940. As the regulations also clearly state that no part of any net operating loss sustained by a corporation prior to a consolidated return period of an affiliated group of which such corporation becomes a subsidiary shall be used in computing the net income of such corporation for any taxable year subsequent to the consolidated return period, it follows that no part of the net operating loss sustained by Bemidji in 1939 may be used by it in computing its excess profits tax net income for 1941, as that loss was sustained in a year prior to the first taxable year in respect of which Bemidji's income was included in the consolidated returns filed by the parent companies in 1940.

In the recomputation of the petitioner's income tax liability for the year 1941, the value of the cash and property received by petitioner upon the liquidation of Bemidji in 1942 in the amount of $152,515.51 was properly taxable to him as ordinary income in that year. However, it appears that the value of the assets received by petitioner upon the liquidation of Bemidji should be reduced in the amount of the income, declared value excess profits, and excess profits tax deficiencies which will finally be determined under Rule 50 as owing by Bemidji for the taxable years ended December 31, 1941 and 1942.

In computing the excess profits tax liability of Bemidji, no part of its net operating loss for 1939 and only that portion of the net operating loss attributable to the period October 15 to December 31, 1940, may be used in computing its excess profits tax net income for 1941. The $17,421.62 deducted by Bemidji for interest which it accrued on its books in 1941 but never paid must also be excluded in computing its net income for that year. The net operating losses sustained by Bemidji during 1939 and 1940 may properly be included in computing its income and declared value excess profits tax liability for the taxable years 1941 and 1942. Various other adjustments agreed to by the parties herein will be given effect in the recomputation in accordance with our opinion herein.

*Decision will be entered under Rule 50.*