**LIFLANS CORPORATION**

v.

**The UNITED STATES.**

**No. 316–64.**

United States Court of Claims.

Feb. 16, 1968.

Harry L. Brown, Washington, D. C., attorney of record, for plaintiff.

Edward Heilbronner, Washington, D. C., with whom was Asst. Atty. Gen. Mitchell Rogovin, for defendant. Philip R. Miller and Joseph Kovner, Washington, D. C., of counsel.

Before COWEN, Chief Judge, LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

## OPINION

### PER CURIAM:

This case was referred to Trial Commissioner C. Murray Bernhardt with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 57(a). The commissioner has done so in an opinion and report filed on November 16, 1967, and a supplemental report filed on November 29, 1967. On January 3, 1968, the parties filed a stipulation wherein they have each agreed not to take exceptions to the report of the commissioner dated November 16, 1967, as amended by the supplemental report dated November 29, 1967, and that judgment should be entered in accordance therewith if approved by the court. Since the court is in agreement with the opinion and recommendation of the commissioner, as amended by the supplemental report, it hereby adopts the same as the basis for its judgment in this case as hereinafter set forth. Therefore, plaintiff is entitled to recover and judgment is entered for plaintiff with the amount of recovery to be determined pursuant to Rule 47(c).

## OPINION OF COMMISSIONER

BERNHARDT, *Commissioner:*

Plaintiff, a Florida corporation organized in 1955 to acquire and then lease the Versailles Hotel in Miami Beach, petitions for a refund of Federal income taxes paid for its fiscal years ended November 30, 1958, 1959 and 1960.

Three basic issues exist as to the deductibility of interest on certain debentures: (1) whether the $600,000 in debentures issued by plaintiff represent debt or risk capital; (2) whether, to the extent Section 267(a) (2), Internal Revenue Code of 1954, prevents the deduction of interest on plaintiff's debentures because not paid within the taxable year plus the following two and a half months, the interest is deductible in the year in which it is paid; and (3) whether debenture interest is deductible with respect to the debentures held by the Morris Lansburgh Company (a partnership of Morris and Jean Lansburgh), and by Robert S. Levy, in view of the personal and business relationships proscribed by Section 267(a) (2).

It is found (1) the debentures represented debt rather than equity so that the interest is deductible under Section 163(a) of the 1954 Code if not precluded by other section; (2) Section 267 of the 1954 Code precludes the deduction of that interest which was accrued on the debentures during the taxable year but which was not paid until after the taxable year plus two and a half months to the extent that such debentures were held or are considered to have been held by persons other than Robert S. Levy and Jean Lansburgh; and (3) interest on the debentures held by Robert S. Levy and on Jean Lansburgh's half of the debentures held by the Morris Lansburgh Company partnership is deductible as accrued regardless of the date of payment.

Plaintiff, an accrual basis taxpayer, was formed by several individuals and trusts to buy the Versailles Hotel in Miami Beach from its French owners. The final purchase price was $1,275,000, with $400,000 to be paid in cash by the time of closing and the remainder to be paid in eight months. This is an atypical arrangement for the sale of Miami Beach hotel property, which is commonly sold for 20 to 25 percent cash with the balance secured by 15–18 years' mortgages.

Plaintiff planned to double the size of the hotel, to refurbish it, and to make other improvements. To this end Morris Lansburgh, who negotiated the purchase for plaintiff, secured a commitment for a long-term, $1,250,000 mortgage loan from a life insurance company. Part of this loan, plus (1) $150,000 paid in for the plaintiff's capital stock, (2) advances secured by a second mortgage, and (3) advances for which the debentures in question were issued, was used by plaintiff to pay the previous owners, and part for the expansion program initiated after plaintiff assumed control. Open-account advances in connection with the expansion program, were repaid in short order.

As the improvements neared completion, plaintiff received an unsolicited offer of $4 million for the property, which was $1,247,000 over the cost basis of the property as improved. This offer gave plaintiff reason to believe it had an unrecorded equity in the property of $1,247,000, in addition to the $150,000 in paid-in capital.

Plaintiff considered its $150,000 capitalization sufficient because, since it intended to lease out the hotel to an operating entity, it would have few operating expenses and little need for substantial capital. Anticipated rental income and substantial non-taxable cash flow from the accelerated depreciation provisions of the then recently enacted 1954 Code provided ample assurance that proposed debentures could be retired without difficulty. Therefore, plaintiff's board of directors in December 1955 authorized the issuance of $600,000 in eight percent debentures to be repaid in seven years. These were subscribed to by members of the stockholder-creditor group, as will appear. Plaintiff's cash flow from accelerated depreciation for fiscal 1955 through fiscal 1962 exceeded its principal payments on the debentures by more than $733,000. Because of a severe, unforeseeable slump in the Miami Beach hotel business in the late 1950's and early 1960's resulting from the "big freeze" of 1957, and an unanticipated Federal income tax assessment of about $100,000, the plaintiff in 1962 was compelled to extend the due date of the debentures until November 1965 and to modify the first mortgage agreement with the insurance company. All interest on the debentures which was unpaid as of November 30, 1960, was waived. Until the time of the extension, plaintiff had paid off nearly $514,000 of the debentures. The remaining $86,000 was repaid within 18 months.

Beginning in 1956 plaintiff made payments to its debenture holders and deducted the interest thereon from its Federal income tax for the years when accrued. The Internal Revenue Service disallowed all but about $9,400 of the approximately $189,000 in interest claimed as a deduction on the basis that it was not paid within the statutory period of the taxable year plus two and a half months as required by Section 267 of the 1954 Code.

*I—Debt versus Equity issue*

■ In this action, plaintiff claims that the debentures were bona fide debt, which contention defendant at first did not challenge. Two years after filing its answer in this action, defendant by afterthought amended its answer, and alleged that the debentures represented "equity capital" rather than debt, with predictable tax consequences.

In two recent cases, American Processing & Sales Co. v. United States, 371 F.2d 842, 178 Ct.Cl. 353 (1967), and Jack Daniel Distillery, etc., v. United States, 379 F.2d 569, 180 Ct.Cl. 308 (1967), this court has dealt extensively with the problem of distinguishing between corporate debt and risk capital. The court said in American Processing & Sales Co. v. United States, supra, 371 F.2d at 848, 178 Ct.Cl. 362–363:

> \* \* \* There is no dearth of cases in this province of tax law. \* \* \* At most they offer tentative clues to what is debt and what is equity for tax purposes; but in the final analysis each case must rest and be decided upon its own unique factual flavor, dissimilar from all others, for the intention to create a debt is a compound of many diverse external elements pointing in the end to what is essentially a subjective conclusion.

The court then set out five criteria which it felt were basic to the debt-equity distinction.[1] They are: (1) the true or real intention of the parties as expressed in the instrument and corroborated by surrounding facts; (2) ratio of debt to equity in the financial structure of the debtor; (3) reasonable expectation of

---

1. Mertens notes 24 different criteria which have been considered by various courts in making the debt-equity distinction. 4A Mertens, Law of Federal Income Taxation, § 26.10c, pp. 66–72.

repayment regardless of the success of the venture; (4) the substantial economic reality of the transaction; and (5) the maintenance of proportional holdings by stockholders whose purported loans remain in "suspicious balance" with their capital contributions. American Processing & Sales Co. v. United States, supra, 371 F.2d at 848, 178 Ct.Cl. at 363.

In determining plaintiff's true or real intention, it is clear from the facts that the plaintiff intended to create a debt instrument. While the form of the instrument is not controlling, it is relevant and entitled to consideration. Crawford Drug Stores v. United States, 220 F.2d 292 (10th Cir. 1955). The debentures here, as was true in the note found to be debt in Jack Daniel Distillery, etc., supra, 379 F.2d at 582, 180 Ct.Cl. at 328, contained an unqualified promise to pay principal and interest, had a definite maturity date, provided means for enforcement of collection at maturity, and ranked equally with the general, unsecured creditors of the corporation.

Until unforseen economic difficulties hit the Miami Beach hotel business in the late 1950's, plaintiff made payments of principal and interest regularly. At that time, plaintiff sought and was given a three-year extension to repay the remaining $86,000, and completed payments within 18 months. The fact that payments were initially made as proposed, and that all payments were eventually made, are strong indicia of the intent to create debt instruments. Cf. Charles Curry, 43 T.C. 667 (1965); Amleto U. Salvadore, 22 CCH Tax Ct. Mem. 1718 (1963).

Against these considerations must be balanced the facts that the extension was sought, and that unpaid interest payments prior to 1960 were waived. The findings conclusively show that unforeseen business difficulties caused plaintiff to seek the extension. The creditors' lenience neither erased the debt characteristics of the instrument nor refuted plaintiff's intent to create a valid debt.

The ready waiver of the interest by the debenture holders is, of course, a factor which militates against a debt characterization. But the overwhelming weight of the evidence on the intent of the parties as manifested by the instrument and surrounding circumstances inescapably leads to the conclusion that plaintiff in this instance did intend to create and maintain a debt rather than make a disguised capital contribution.

■ The factor of the debt-equity ratio, while no longer as popular or conclusive as in the past (American Processing & Sales Co. v. United States, supra, 371 F.2d at 848, 178 Ct.Cl. at 363), is nevertheless relevant. Plaintiff's debt-equity ratio ranged from 17:1 to 2:1, depending on when computed and whether the book value or the market value of the assets is used. Thus, at the time of completion of the purchase, the book ratio was 7.8 to 1. After the completion of the enlargement of the hotel, the book ratio was 17 to 1. If the property is considered to have been worth the initially negotiated price of $1,450,000, rather than the amount of the cash sale, the ratio was 3.6 to 1 at the time of purchase and 8 to 1 after the completion of the enlargement. Courts have noted that discounts are often given for cash sales (see Kingsford Co., 41 T.C. 646 (1964), acq. 1964–2 C.B. 6; Charles Curry, supra), and that fact would seem to be particularly relevant in this situation since Miami Beach hotel property was not usually sold on a cash basis. If the property is given its appraised value for local tax purposes, or its value as given by Morris Lansburgh to the insurance company for mortgage purposes, the ratios were 2.5 to 1 at the date of purchase and 5 to 1 after expansion. Based on the $4 million offer received by plaintiff at the time of completion of the expansion, the ratio would be 2 to 1. However, defendant objected to the admissibility of the offer. While it is true that offers to purchase real property, even if unsolicited, are generally inadmissible to show the value of the property (Estate of Ridgely v. United States, 180 Ct.Cl. 1220, 1240 (1967); Sharp v. United States, 191 U.S. 341, 24 S.Ct. 114, 48 L.Ed. 211 (1903)), evidence

of offers may be admitted without error for other purposes. United States v. Hart, 312 F.2d 127 (6th Cir. 1963). See annotation, 7 A.L.R.2d 781 (1949). In the present case, plaintiff offered the evidence of the purchase offer not to show the precise value of the property, but to establish that plaintiff reasonably believed the property to be worth far more than its book value.

Even using the book value of the assets, plaintiff's greatest debt-equity ratio of 17 to 1 is well within limits courts have accepted. See, for example, Charles Curry, supra, (30 to 1 ratio) Sun Properties v. United States, 220 F.2d 171 (5th Cir. 1955) (310 to 1 ratio); Baker Commodities, Inc., 48 T.C. 374 (1967) (692 to 1 ratio). However—

> * * * [t]he prevailing view seems to be that assets are to be taken at fair market value rather than at book value when valuing the equity interest in order to compute the ratio. Goldstein, "Corporate Indebtedness to Shareholders", 16 Tax L.Rev. 1, 19 (1960).

Accord, Kraft Foods Co. v. Commissioner of Internal Revenue, 232 F.2d 118, 127 (2nd Cir. 1956).

Using fair market value in the present case, the ratios are all within the 8 to 1 ratio found to be safe in *Jack Daniel, etc.* supra,[2] and do not defeat plaintiff's assertion of a debt characterization.

The next factor to be considered is whether there was a reasonable expectation of repayment regardless of the success of the business. This factor has been held to be "essential to the creation of a debtor-creditor relationship". Irbco Corp., 25 CCH Tax Ct. Mem. 359, 366 (1966).

Based on plaintiff's projected cash flow which would be generated by taking advantage of the accelerated depreciation provisions of the 1954 Code, there was clearly a reasonable expectation of payment regardless of the success of the business. That this expectation was reasonable is supported by the fact that approximately 85 percent of the debenture payments were made on schedule, even though the plaintiff had a taxable income during that period of less than $59,000. The projection here, as in *Jack Daniel Distillery, etc.*, supra, 379 F.2d at 583, 180 Ct.Cl. at 330, proved to be conservative, with cash flow exceeding the principal payments on the debentures by more than $733,000 over the seven-years' period beginning in 1955. The fact that an unforeseeable slump in the hotel industry caused plaintiff to seek a three-years' extension is of relatively minor import when judging the reasonableness of the expectation of repayment. Finally, again as in *Jack Daniel, etc.*, supra, the reasonableness of the expectation was verified by complete repayment, in this case only 14 months after the original date for repayment.

At first blush it might appear that this case falls within the ambit of Affiliated Research, Inc. v. United States, 351 F.2d 646, 173 Ct.Cl. 338 (1965), which held, *inter alia*, that the likelihood of repayment is less important than the issue of whether repayment is dependent upon the success of the venture. The distinction the court made when discussing the *Affiliated Research* rationale in *Jack Daniel, etc.*, supra, 379 F.2d at 584, 180 Ct.Cl. at 331, is apposite in the present case:

> * * * Moreover, the case at bar is distinguishable from *Affiliated Research*, supra, on two important grounds: first, the corporation there did not have a substantial amount of equity investment in it, and second, and more important, there was no finding that there was a reasonable expectation of repayment.

In the present case, plaintiff had a minimum equity investment of $150,000, far in excess of the amount needed to carry on its operations, and there is every in-

---

**2.** It should be noted that the Internal Revenue Service, after its initial investigation, determined that plaintiff was not "thinly capitalized". This issue was raised by the Government by amended answer two years after its answer was filed in this court.

dication that its actual equity was far more than this amount. In any event, it was easily "substantial equity" in the context of *Affiliated Research* and *Jack Daniel, etc.* It has also been found that a reasonable expectation of repayment existed in this case.

The next factor to consider is whether the issuance of the debentures, and their characterization as debt, comported with substantial economic reality. This term, as defined in Gilbert v. Commissioner of Internal Revenue, 248 F.2d 399, 406–407 (2nd Cir. 1957), goes to the question not of what the taxpayer's purpose is in creating the instrument, but what the instrument is in fact, in the context of the tax laws. To determine the reality of the situation in *Gilbert*, the court looked at whether repayment depended upon the success of the taxpayer's business. In the present case it seems clear that repayment did not depend on the success of the business, since plaintiff's taxable income for the period in question was less than $59,000 while the plaintiff paid a total of over $738,000 in principal and interest. These funds came not from the profits of the business, but from non-taxable cash flow generated by accelerated depreciation.

A reading together of the cases in which the criterion of substantial economic reality has been developed, principally Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935); Kraft Foods Co. v. Commissioner of Internal Revenue, supra; Gilbert v. Commissioner of Internal Revenue, supra; and American Processing & Sales Co. v. United States, supra, leads to the conclusion that this criterion goes to the broader question of whether the challenged transaction is compatible with sound business practice.

In the present case plaintiff had a demonstrated need for funds at its inception to close the cash sale and to expand and remodel the hotel. Yet it had no need for a large surplus of liquid capital, since operating expenses would be minimal in leasing the hotel to an operating company. Further, it had no operating need for the cash flow which would be generated by the accelerated depreciation. It, therefore, is evident that the issuance of the debentures to raise funds initially needed, and the plan to pay off the debentures with the anticipated cash flow, were in accord with sound business practice. As restated in Jack Daniel Distillery, etc. v. United States, 379 F.2d at 584, 180 Ct.Cl. at 332, the stockholders, and not the Government, have the right to determine the financing arrangements of a corporation. The valid business reasons for plaintiff's transactions also negate the inference that plaintiff was attempting to perpetrate a tax hoax. See Jack Daniel Distillery, etc. v. United States, supra, 379 F.2d at 584, 180 Ct.Cl. at 332; American Processing & Sales Co. v. United States, supra, 371 F.2d at 848, 178 Ct.Cl. at 363.

The final consideration is the maintenance of debt holdings by stockholders in proportion to their capital contributions. Proportionality of debt holdings to stockholdings contributes to evidence that the advances constitute equity rather than debt. Affiliated Research, Inc. v. United States, supra, 351 F.2d at 648, 173 Ct.Cl. at 344–345. In the present case, proportionality does exist if debenture ownership by a partnership is attributed to one of the partners who is a stockholder in plaintiff corporation, and if stock ownership by two trusts is attributed to the debenture holder who set them up. But this factor alone is not controlling, and must be weighed against all the factors in the case. Cf. Brighton Recreation, Inc., 20 CCH Tax Ct.Mem. 127, 135 (1961). It is true, as defendant contends, that proportionality has been an important factor in many cases holding that instruments denominated debt actually represented equity. But in those cases, such as *Affiliated Research* which was relied upon by defendant, many other factors also militated against a debt characterization.

Defendant stresses in addition that the debentures were subordinated to a first and second mortgage, and to certain notes, which subordination negates an

important characteristic of a debtor-creditor relationship: the right to share with general creditors in corporate assets upon dissolution or liquidation. See John Wanamaker Philadelphia v. Commissioner of Internal Revenue, 139 F.2d 644 (3rd Cir. 1943), where, as defendant further emphasizes, there was complete subordination. In the present case the debentures specifically provided that holders would rank with general creditors. As the court said in Kraft Foods Co. v. Commissioner of Internal Revenue, supra, 232 F.2d at 125–126:

> * * * Subordination to general creditors is not necessarily indicative of a stock interest. Debt is still debt despite subordination.

Here, as in Jack Daniel Distillery, etc. v. United States, supra, 379 F.2d at 582, 180 Ct.Cl. at 328, the subordination of the debt to debts held by secured creditors is outweighed by other factors. This is true even though the general creditors were also stockholders.

Finally, the Government urges that Isidor Dobkin, 15 T.C. 31 (1950), aff'd per curiam, 192 F.2d 392 (2nd Cir. 1951), is a controlling precedent in the present case. In *Dobkin*, each of four men paid $7,000 into a corporation formed to purchase an apartment building. Each $7,000 contribution was divided between capital stock having a stated value of $500 and six percent demand notes of the corporation for the remaining $6,500. The property was later sold at a loss and the parties claimed a bad debt deduction. The court held, at 33:

> * * * When the organizers of a new enterprise *arbitrarily* designate as loans the major portion of the funds they lay out in order to get the business established and under way, a strong inference arises that the entire amount paid in is a contribution to the corporation's capital and is placed at risk in the business. (Emphasis added.)

*Dobkin* is not controlling, because here the division was not arbitrary, but part of a carefully planned financial structure which took into account the need for modest operating capital; the need for funds for immediate expansion and remodeling; and the anticipated non-taxable cash flow.

*II—Delay in payment issue*

The second issue is whether Section 267(a)(2) of the 1954 Code[3] prevents

---

3. SEC. 267. LOSSES, EXPENSES, AND INTEREST WITH RESPECT TO TRANSACTIONS BETWEEN RELATED TAXPAYERS.

[Sec. 267(a)]

(a) *Deductions Disallowed.*—No deduction shall be allowed—

(1) *Losses.*—In respect of losses from sales or exchanges of property (other than losses in cases of distributions in corporate liquidations), directly or indirectly, between persons specified within any one of the paragraphs of subsection (b).

(2) *Unpaid Expenses and Interest.*—In respect of expenses, otherwise deductible under section 162 or 212, or of interest, otherwise deductible under section 163,—

(A) If within the period consisting of the taxable year of the taxpayer and 2½ months after the close thereof (i) such expenses or interest are not paid, and (ii) the amount thereof is not includible in the gross income of the person to whom the payment is to be made; and

(B) If, by reason of the method of accounting of the person to whom the payment is to be made, the amount thereof is not, unless paid, includible in the gross income of such person for the taxable year in which or with which the taxable year of the taxpayer ends; and

(C) If, at the close of the taxable year of the taxpayer or at any time within 2½ months thereafter, both the taxpayer and the person to whom the payment is to be made are persons specified within any one of the paragraphs of subsection (b).

SOURCE: Secs. 24(b)(1), 24(c), 1939 Code.

[Sec. 267(b)]

(b) *Relationships.*—The persons referred to in subsection (a) are:

(1) Members of a family, as defined in subsection (c)(4);

(2) An individual and a corporation more than 50 percent in value of the outstanding stock of which is owned, directly or indirectly, by or for such individual;

(3) Two corporations more than 50 percent in value of the outstanding stock

interest from being deducted whenever paid, if it is not paid in the taxable year in which it is accrued, plus the two and a half months following the end of the taxable year.

The predecessor of Section 267(a) (Section 301(a), Revenue Act of 1937, amending Section 24(a), Revenue Act of 1936) was enacted in 1937 to prevent closely related persons, including corporations, from accruing various types of payments, including interest on debt, without actually making payment to cash-basis taxpayers, since this would result in a deduction for the accrual-basis taxpayer with no corresponding taxable income for the cash-basis taxpayer. See generally, Paul, "The Background of the Revenue Act of 1937", 5 U.Chi.L.Rev. 41 (1938).

In making a report on the proposed legislation to the Congress, the Joint Committee on Tax Evasion and Avoidance stated:

* * * It is therefore recommended that * * * under Sec. 23(b), [interest] accrued by the debtor within the taxable year but not paid within two and one half months after the close of the taxable year should be disallowed. H.Doc. No. 337, 75th Congress, 1st Session, p. 16.

Plaintiff contends that Congress intended not to disallow the deduction absolutely if not made within the taxable year plus two and a half months, but only to defer the deduction until payment is actually made. Judicial and administrative interpretation of the statute opposes plaintiff's construction.

In a 1939 ruling, the Commissioner held that even though payments were not delayed by the taxpayer in order to evade

of each of which is owned, directly or indirectly, by or for the same individual, if either one of such corporations, with respect to the taxable year of the corporation preceding the date of the sale or exchange was, under the law applicable to such taxable year, a personal holding company or a foreign personal holding company:

(4) A grantor and a fiduciary of any trust;

(5) A fiduciary of a trust and a fiduciary of another trust, if the same person is a grantor of both trusts;

(6) A fiduciary of a trust and a beneficiary of such trust;

(7) A fiduciary of a trust and a beneficiary of another trust, if the same person is a grantor of both trusts;

(8) A fiduciary of a trust and a corporation more than 50 percent in value of the outstanding stock of which is owned, directly or indirectly, by or for the trust or by or for a person who is a grantor of the trust; or

(9) A person and an organization to which section 501 (relating to certain educational and charitable organizations which are exempt from tax) applies and which is controlled directly or indirectly by such person or (if such person is an individual) by members of the family of such individual.

SOURCE: Sec. 24(b) (1) (A)–(F), 1939 Code.

[SEC. 267(c)]

(c) *Constructive Ownership Of Stock.* —For purposes of determining, in applying subsection (b), the ownership of stock—

(1) Stock owned, directly or indirectly, by or for a corporation, partnership, estate, or trust shall be considered as being owned proportionately by or for its shareholders, partners, or beneficiaries;

(2) An individual shall be considered as owning the stock owned, directly or indirectly, by or for his family;

(3) An individual owning (otherwise than by the application of paragraph (2)) any stock in a corporation shall be considered as owning the stock owned, directly or indirectly, by or for his partner;

(4) The family of an individual shall include only his brothers and sisters (whether by the whole or half blood), spouse, ancestors, and lineal descendants; and

(5) Stock constructively owned by a person by reason of the application of paragraph (1) shall, for the purpose of applying paragraph (1), (2), or (3), be treated as actually owned by such person, but stock constructively owned by an individual by reason of the application of paragraph (2) or (3) shall not be treated as owned by him for the purpose of again applying either of such paragraphs in order to make another the constructive owner of such stock.

SOURCE: New.

payment of taxes, interest payments must be made within the statutory period to be deductible. I.T. 3319, C.B. 1939–2, p. 161. In a regulation interpreting Section 24(c) of the 1939 Code, the Commissioner determined that a deduction could not be allowed for the year in which the payment was made, but only for payments made within the statutory period. Section 29.24–7, Regs. 111.

The courts have vindicated this initial administrative interpretation. In North American Service Co., Inc., 33 T.C. 677 (1960), remanded on compromise, 61–1 U.S. Tax Cas.Para. 9353 (7th Cir. 1961), the court held that no deduction is allowable for the year in which the interest is paid. The payment must be made within the taxable year plus two and a half months to be deductible. See, also, Lincoln Storage Warehouses v. Commissioner of Internal Revenue, 189 F.2d 337, 28 A.L.R.2d 595 (3rd Cir. 1950); Burton Swartz Land Corp. v. Commissioner of Internal Revenue, 198 F.2d 558 (5th Cir. 1952).

In dealing with another potentially deductible item under Section 267, it has been ruled that salaries which were accrued but not paid within the statutory period are not thereafter deductible as business expenses. Aptitude Associates, Inc., 21 CCH Tax Ct.Mem. 1485 (1962), aff'd per curiam, 324 F.2d 499 (4th Cir. 1963). See also, D. J. Jorden, 11 T.C. 914 (1948).

There need not even be actual receipt of the payments within the statutory period; constructive receipt is sufficient. Geiger & Peters, Inc., 27 T.C. 911 (1957). But there must be some kind of payment and receipt within the period, or the deduction must be disallowed.

Plaintiff relies on Russell Manufacturing Co. v. United States, 175 F.Supp. 159, 146 Ct.Cl. 833 (1959), which held that contributions by an employer to profit-sharing trusts were deductible when dis-tributions from the trust were made. However, the profit-sharing trust situation is not analogous to the deduction of interest payments. The code section in question there was intended to deny tax advantages to employers. Russell Manufacturing Co. v. United States, supra. 175 F.Supp. at 162, 146 Ct.Cl. at 839. The code section in the present case was intended to penalize taxpayers by disallowing deductions unless paid within the statutory period, as discussed above. Further, the section in the present case was enacted to prevent accrual and deduction where there is no actual payment. In the profit-sharing situation, the employer had set aside funds in trust, resulting in no apparent danger that payment would not eventually be made.

■■ All three of the conditions set out in Section 267(a) (2) must be present to render this restrictive section effective. Akron Welding & Spring Co., 10 T.C. 715 (1948); Granberg Equipment, Inc., 11 T.C. 704 (1948). The facts here show that most of the interest payments were not made within the statutory period.[4] Although it is not apparent from the record, it must be assumed that the debenture holders are cash-basis taxpayers, since the burden of proof is on the taxpayer to show that the recipient is not a cash-basis taxpayer. North American Service Co., supra, 33 T.C. at 696.

*III—The meaning of "Persons" issue*

The third issue is whether certain of the debenture holders are "persons" as designated in Section 267(a) (2) (C), thereby giving effect to this Code provision and precluding deduction of interest paid to them. See n. 3, supra. Plaintiff concedes that interest on the debentures held by Erwin Fried ($30,000 in debentures) and Daniel Lifter ($200,000 in debentures) is not deductible since they are "persons" under Section 267

---

4. The record fails to reveal why the payments were not made within the period. This failure to follow the requirements of the Code is inconsistent with plaintiff's other actions, particularly the use of accelerated depreciation, which were carried out with full awareness of Code provisions. This failure is also inconsistent with plaintiff's stockholders' extensive business experience.

(b), thereby making the section applicable.

■■ Fried, Lifter, and Morris Lansburgh owned 5 percent, 33⅓ percent, and 28⅓ percent of plaintiff's stock, respectively. They were also partners during the period in question. Applying Section 267(c) (3), the stock owned by all of the partners is deemed to be constructively owned by each of them. As a result, Fried and Lifter are each deemed to own 66⅔ percent of the stock, which is more than the 50 percent required for the application of Section 267(b) (2). Morris Langsburgh owned none of the debentures personally. However, he, too, is deemed to own 66⅔ percent of plaintiff's stock, which determination becomes important in a later part of this opinion.

■ Interest on the debentures held by Robert S. Levy ($200,000 in debentures) is deductible as accrued. Applying Section 267(c) (1), the 25 shares of plaintiff's stock owned by the Levy Brookside Trust and the Robert S. Levy Trust are deemed to be owned by Robert S. Levy's sons, Richard and Harry, the beneficiaries of the trusts. The combination of these shares with the 8⅓ shares owned personally by Harry Levy totals 33⅓ percent of plaintiff's stock. This is the maximum number of shares which can be attributed to Robert S. Levy, even though he was a partner of Fried and Lifter from 1955 through 1957. Ownership of plaintiff's stock by Fried and Lifter cannot be attributed to Robert S. Levy under Section 267(c) (3), since attribution of stock ownership from one partner to another is limited to the situation where such partner "(otherwise than by application of paragraph (2))", owns stock in the corporation. Robert S. Levy is deemed to own stock only through the application of Section 267(c) (2). Therefore, the stock his partners owned may not be attributed to him. He is deemed to own only the 33⅓ percent attributed to him through his sons. This is less than the 50 percent required to make Section 267(b) (2) operative. Therefore, the restrictions of Section 267 do not apply to the debentures owned by Robert S. Levy.

The most difficult question of attribution involves the $170,000 in debentures owned by the Morris Lansburgh Company. The issue is whether, when a partnership owns corporate debentures and a member of the partnership (here Morris Langsburgh with constructive ownership of 66⅔ percent of the stock) owns more than 50 percent of the stock, the corporation (plaintiff here) is prevented by Section 267 from deducting the interest on the debt.

To decide this question, it must first be determined whether a valid partnership existed and, if so, whether a partnership is to be considered an "individual" for the purposes of Section 267(b) (2).

Defendant asserts that the Morris Lansburgh Company, a husband and wife partnership of Morris and Jean Lansburgh, was not a valid partnership, but in substance was a receptacle for Morris Lansburgh's income, and, therefore, it was Morris Lansburgh who in reality owned the debentures. However, the facts (see particularly findings 58–62) indicate that the Morris Lansburgh Company was a valid partnership during the period in question. It was formed in 1945 to engage in the watch-importing business, with the partners each contributing to the partnership capital. The watch business was terminated by 1950 and the partnership turned to the investment in, and operation of, hotels in the Miami Beach area. During the years in question, 1956–60, Morris Lansburgh made the basic investment decisions for the partnership; Jean Lansburgh contributed services to the partnership's hotel operations aspect. The Morris Lansburgh Company partnership was a member of the operating partnerships which operated the hotels and Morris Lansburgh was heavily involved in the day-to-day operation of these hotels as a member of the Morris Lansburgh Company partnership.

Defendant relies on Commissioner of Internal Revenue v. Tower, 327 U.S. 280, 291–292, 66 S.Ct. 532, 90 L.Ed. 670

(1946), which held that a limited partnership between a husband and wife which was set up to continue the husband's corporate business, was not to be recognized as a partnership for tax purposes because the partnership was set up as a vehicle for a "mere paper reallocation of income". Further, the court found that "no genuine union for partnership business purposes was ever intended and that the husband earned the income". In the present case the partnership was set up for a genuine business purpose and continued to have one. Both husband and wife earned the income.

■ True, the Morris Lansburgh Company has not filed any partnership Federal income tax returns since 1948, when Congress enacted the provision permitting husband and wife to file joint returns. While this fact weighs against the conclusion that a partnership existed, it must be noted that Section 708(a) of the 1954 Code provides that "an existing partnership shall be considered as continuing if it is not terminated". Nothing in the record indicates that the partnership was terminated; on the contrary, the partnership maintained a bank account separate from the partners' joint account. Further, although the partnership failed to file partnership income tax returns, the partners filed a joint income tax return for the years in question in which partnership income was reflected.[5]

Having found that a valid partnership existed, it must now be determined whether a partnership is an "individual" under Section 267(b) (2) (see n. 3, supra). Plaintiff urges that a partnership should be treated as an entity for tax purposes, and therefore, as in the cases

of an estate, Hanna's Est. v. Commissioner of Internal Revenue, 320 F.2d 54 (6th Cir. 1963), and of a trust, John A. Snively, 20 T.C. 136 (1953), a partnership is not an individual under Section 267.

However, in a decision which discussed at length the "entity" and "aggregate" theories of partnership, the Second Circuit Court of Appeals held that "the tax law adopts the common-law concept of the partnership as an aggregate of individuals operating the properties of the partnership as co-owners". Commissioner of Internal Revenue v. Whitney, 169 F.2d 562 (2nd Cir. 1948), reversing 8 T.C. 1019 (1947), cert. denied, 335 U.S. 892, 69 S.Ct. 246, 247, 93 L.Ed. 429 (1948). In this decision the court was interpreting the predecessor of Section 267 and reached the conclusion that a partnership is to be treated as an aggregate of individuals, thereby making the section applicable since more than 50 percent of the stock was owned by the individual partners. See also, Craik v. United States, 31 F.Supp. 132, 90 Ct.Cl. 345 (1940), which also adopted the aggregate theory of partnership.

■ As a result, the fact that Morris Lansburgh is deemed to own 66⅔ percent of plaintiff's stock through his partnership with Fried and Lifter precludes deduction of interest on his half ($85,000) of the debentures owned by Morris Lansburgh Company, Lansburgh is an individual for tax purposes and he holds more than 50 percent of the corporation's stock, making Section 267 effective.

■ However, interest accrued on the half of the partnership's corporate debentures apportioned to Jean Lansburgh is deductible as accrued. She own-

---

5. It should also be noted that the application of Sec. 704(e) (1), 1954 Code, which reads:

"A person shall be recognized as a partner for the purposes of this subtitle if he owns a capital interest in a partnership in which capital is a material income-producing factor, whether or not such interest was derived by purchase or gift from any other person."

would also lead to the conclusion that a valid partnership existed, since the capi-

tal which Jean Lansburgh contributed was "a material income-producing factor" in the investment aspect of the partnership. Sec. 704(e) (1) was enacted in 1951 to clear up confusion which Congress found to exist after the decision in Commissioner of Internal Revenue v. Tower. See H.Rep.No. 586, 82d Congress, 1st Sess. and Senate Rep.No. 781, 82d Congress, 1st Sess. (1951-2 C.B. at pp. 380–81 and 485–86), U.S.Code Cong. & Admin.News 1951, p. 1781 et seq.

ed no shares of plaintiff's stock; she may be considered to own constructively only the 28⅓ percent held by her husband through the application of Section 267 (c) (2). She cannot be deemed to own the shares constructively owned by her husband through his partnership with Fried and Lifter, since Section 267(c) (5) provides that stock constructively owned by her husband through the application of Section 267(c) (3) "shall not be treated as owned by him for the purpose of again applying [paragraph 2] * * * in order to make another the constructive owner of such stock". Jean Lansburgh's maximum share of the stock is 28⅓ percent, less than the 50 percent plus to make the section applicable.

### SUMMARY

In summary, plaintiff was entitled to deduct interest of $89,792.61 which was accrued within the period of the claim attributed to the debentures held by Robert S. Levy ($200,000) and Jean Lansburgh ($85,000) rather than the amount ($4,463.77) allowed with respect to such debentures by the I.R.S.

Accordingly, plaintiff is entitled to recover with the amount of recovery to be determined pursuant to Rule 47(c).