Alstate-Schuylkill Company v. Commissioner.
Alstate-Schuylkill Co. v. Commissioner
Docket No. 2974-67.
United States Tax Court
T.C. Memo 1969-9; 1969 Tax Ct. Memo LEXIS 286; 28 T.C.M. (CCH) 32; T.C.M. (RIA) 69009; January 14, 1969, Filed Jules I. Whitman, 2600 The Fidelity Bldg., Philadelphia, Pa. 19109, for the petitioner, Albert Squire, for respondent. 33 FEATHERSTON
Memorandum Findings of Fact and Opinion FEATHERSTON, Judge: Respondent determined deficiencies in petitioner's Federal corporate income tax as follows: Fiscal Year Ended
Amount
March 31, 1961
$ 6,044.81
March 31, 1962
7,636.48
March 31, 1964
20,694.08
Certain issues have been conceded by the parties. The only question remaining for decision *287 is whether petitioner's advances of funds to Roustabout, Inc., created a debt which became worthless in the fiscal year 1964, entitling petitioner to a deduction under section 166(a)(1), [1] or an equity interest, entitling petitioner only to a capital loss deduction. Findings of Fact Some of the facts have been stipulated and are so found. The stipulations and exhibits thereto are incorporated herein by this reference. Petitioner Alstate - Schuylkill Company (hereinafter referred to as "petitioner"), a corporation, was organized on or about March 31, 1952, under the laws of Pennsylvania. Petitioner had its principal place of business in Harrisburg, Pennsylvania, at the time of the filing of the petition herein. Petitioner filed its corporate income tax returns on an accrual basis with the district director of internal revenue, Philadelphia, Pennsylvania, for the fiscal years ended March 31, 1961, March 31, 1962, and March 31, 1964. At all relevant times petitioner was engaged in the business of road construction and the extraction, crushing, and selling of stone and *288 slag for road building purposes. Its stock was owned as follows: Number of
Stockholder
Shares
Joseph L. Maguire
350
Richard J. Maquire (son of Joseph)
133
Steve Comisac 207
Total
690
The three stockholders were also directors The three stockholders were also directors and officers of petitioner as follows: Joseph L. Maguire, President and Treasurer; Richard J. Maguire, Vice-President; and Steve Comisac, Secretary. J. Robert Bazley, Inc., a corporation, was engaged in three businesses in the Pottsville, Pennsylvania, area: Heavy road construction; strip mining of coal; and repair and maintenance of heavy construction machinery. Approximately 36 percent of the stock of J. Robert Bazley, Inc., was owned by J. Robert Bazley; approximately 60 percent by members of his family, and 4 percent by unrelated shareholders. The principal officers and directors of J. Robert Bazley, Inc., were also members of the Bazley family. On September 8, 1961, The Roustabout Company (hereinafter called "Roustabout") was incorporated under the laws of Pennsylvania by J. Robert Bazley, James R. Bazley, and Max C. Hempt (collectively referred to as the "Bazley group"). *289 Roustabout was formed to manufacture a one-half ton utility truck of unconventional design having only three wheels - two in front and one in the rear, known then as the "Roustabout," but later called the "Trivan." On September 12, 1961, Roustabout purchased from Harry Payne all of the assets of a Delaware corporation which had been organized to develop a three-wheel truck. The assets consisted of prototypes, drawings, manufacturing rights, and similar items. The selling price was $115,587.46, all paid in cash. The cash was advanced to Roustabout by J. Robert Bazley, Inc., in exchange for Roustabout's note. The idea of the three-wheel vehicle had been developed to the point where Payne believed production could be started. Roustabout hired Payne as a consultant for the two-year period beginning September 12, 1961. He was to receive $50,000 for the two years, payable monthly, and royalties for each vehicle produced and sold. Roustabout was originally authorized to issued 3,000 shares of capital stock having a par value of $100 per share. On November 6, 1961, this authorization was changed to 300,000 shares having a par value of $1 per share. As of November 29, 1961, Roustabout had *290 6,080 shares issued and outstanding, owned principally by the Bazley group. Neither petitioner nor its shareholders owned any Roustabout stock as of November 29, 1961. The directors, officers, and major individual shareholders of Roustabout were, for the most part, individuals with extensive experience in business or management positions. Most of them were familiar with the acquisition, maintenance, and operation of large fleets of motor vehicles or with sales and management in the automobile industry. However, these individuals had no previous 34 experience in production or marketing of a novel vehicle like the three-wheel Trivan. In November 1961, Roustabout began negotiations with the Greater Pottsville Industrial Development Corporation (hereinafter referred to as "GPIDC") to purchase or lease a factory being constructed by GPIDC. Roustabout planned to borrow all of the funds required to purchase the factory from the Pennsylvania Industrial Development Authority (hereinafter the "Authority"), the Small Business Administration (hereinafter "SBA"), GPIDC, and banks. The building, together with 10 acres of land, was expected to cost about $440,000. In January 1962, the Authority *291 notified Roustabout that before it would lend any part of the purchase price of the factor, Roustabout would be required to have $500,000 in equity capital. Shortly thereafter, Roustabout's board of directors took steps to increase its authorized capital from 300,000 shares of $1 par value stock to 1,000,000 shares of $1 par value stock. The board also resolved to qualify the new stock under section 1244. The new authorization became effective on June 15, 1962. To implement the issuance of the new stock, Roustabout issued a prospectus dated June 15, 1962, a copy of which was filed with the Pennsylvania Securities Commission. In April 1962, Roustabout began negotiations for a loan of $500,000 from the Area Redevelopment Administration, a United States Government agency under the Secreary of Commerce (hereinafter referred to as "ARA"), to pay for machinery and heavy tools (and/or equipment). ARA was created by statute in 1961 to help areas of substantial and persistent unemployment and underemployment, by planning their economic redevelopment, in cooperation with the states. Roustabout was located in such an area. ARA was not authorized to lend funds unless the financial assistance *292 sought by the borrower was not otherwise available from private lenders or other Federal agencies on reasonable terms. However, ARA could not lend funds unless it was determined that there was a reasonable assurance of repayment. Roustabout understood that ARA was authorized to lend up to 65 percent of the cost of machinery and tools, provided a bank would lend 20 percent, and the seller of the machinery and tools would lend 15 percent. GPIDC completed construction of a factory in Frackville, Pennsylvania, which Roustabout took possession of on or about September 1, 1962. Until March 28, 1963, Roustabout occupied this factory on a month-to-month lease. On September 1, 1962, Roustabout executed an agreement to purchase the factory for $440,000, but this agreement was contingent upon Roustabout's obtaining mortgage loans from GPIDC, sba,/ and the Authority. The mortgage loans were in turn contingent upon Roustabout's increasing its paid-in capital to $500,000 and obtaining the loan from ARA for machinery and tooling. Petitioner acquired 108,000 shares of Roustabout's stock on dates between August 30, 1962, and January 4, 1963. In November 1962, Roustabout's books were examined *293 by a representative of SBA in connection with Roustabout's application for a loan from ARA. (Personnel of SBA regularly performed services for ARA.) Shortly thereafter, the representative advised Roustabout that before its application would be approved, Roustabout would have to reduce its application from $500,000 to $345,000, and obtain an additional $250,000 in equity capital or subordinated loans, for working capital. On December 26, 1962, Roustabout's board of directors was advised that the SBA, in transmitting Roustabout's application for a loan of $340,000 to ARA, had marked it disapproved on the following grounds: (1) Lack of reasonable assurance that the project could be operated at a rate of profit to repay the loans; (2) inadequate working capital; and (3) insufficiency of the net value of the collateral for the purposes of the loan. However, ARA was interested in overcoming this disapproval and desired certain relevant information: number of vehicles sold, statements from Pottsville buyers as to the number of intended purchases, interest of Government agencies, description of dealer relationship, and where the tooling used for the collateral would be located. On January 14, 1963, the *294 officers of Roustabout met in Harrisburg, Pennsylvania, with representatives of GPIDC, the Authority, SBA, and ARA. At this meeting, the Washington officials set forth the following conditions with respect to Roustabout's application for a loan: (1) A two-year deferment of Payne royalties; (2) an additional $250,000 equity; and (3) participation of the Authority with ARA on its second mortgage position to an amount in excess of the actual value of the building. 35 At the Roustabout board meeting of January 16, 1963, the board concluded that the above conditions made the outlook for the ARA loan discouraging. The board considered sidered alternative possibilities, including the sale of an additional $250,000 worth of stock. At Roustabout's January 22, 1963, board of directors meeting, it was decided that the additional financing of $250,000 would not be obtained by issuing stock but that $150,000 would be borrowed on notes from the Miners National Bank of Pottsville and $100,000 from petitioner. Pursuant to this decision, Roustabout received $150,000 from the Miners National Bank. In exchange for this $150,000, Roustabout gave its demand notes, cosigned by J. Robert Bazley, bearing *295 interest of 4 3/4 percent per annum. These notes were secured by collateral given by J. Robert Bazley, who purchased the notes from the Miners Bank on or about March 28, 1963. In addition, $100,000 was received from petitioner on the following dates: Date
Amount
January 31, 1963
$ 32,000
February 13, 1963
40,000
February 25, 1963 28,000
Total $100,000 In exchange for this $100,000 Roustabout gave its demand negotiable notes bearing interest at 5 percent per annum. Roustabout gave no collateral or security with respect to the advances from petitioner and the Miners Bank. These advances were used for working capital. Petitioner itself did not have $100,000 available to lend to Roustabout in January and February of 1963, but it was able to use its line of credit with the Schuylkill Trust Bank to borrow that sum, thereby reducing the credit available to it for its regular construction business. In addition to the $250,000 advanced by Miners Bank and petitioner, J. Robert Bazley, Inc., between November 16, 1962, and March 21, 1963, advanced $145,000 to Roustabout in exchange for demand notes bearing interest at 4 percent per annum from February 1, 1963. No *296 other shareholders thereafter made advances in the form of loans or suffered losses from Roustabout except in respect of their capital stock. All three advances by the above shareholders were carried on Roustabout's books as liabilities. Petitioner's corporate minutes, dated January 15, 1963, show that when the $100,000 advance to Roustabout was approved the officers and directors believed "that the temporary loan could be paid off in a very short time." This belief that the advances by petitioner, as well as by J. Robert Bazley, would be repaid within one to three years was based, in part, on a chart for the period of October 1, 1962, to September 30, 1965, which projected a large cash flow, amounting to $990,960 by December 31, 1963, and $2,882,850 by December 31, 1964. In this cash flow chart no adjustment was made for Federal income taxes. The chart was based on the assumption that 1,000 vehicles per month could be sold shortly after production began. Also, at a prior board meeting on December 7, 1962, Roustabout's president and general manager had submitted an estimated profit and loss statement for the year 1963. This statement estimated sales of 12,000 vehicles, at $1,200 *297 per vehicle, for total gross sales of $14,400,000. It estimated net profit from these sales of $836,040 based on "present" costs, and $2,456,040 based on target costs. It estimated that 4,623 vehicles would have to be sold to break even on "present" costs, or 2,120 vehicles on target costs. The production schedule was revised on January 15, 1963, to call for two vehicles to be produced during the week of January 21; 10 vehicles, during the week of January 28, for a total production of 12 vehicles in January. For February, the production schedule anticipated a production rate of three per day during the first week, five per day during the second week, seven per day during the third week, and eight per day during the fourth week, for a total expected production of 115 vehicles in the month of February. The production schedule anticipated increasing rates of production during March and April from 10 per day for the first week in March to 50 per day for the fourth week in April. As indicated in its financial statements issued on September 30, 1962, and March 31, 1963 (before and after petitioner made the advances in question), Roustabout intended to amortize certain unrecovered development *298 expenses by making direct charges against income during the first five years of production. The cost of prototypes, drawings, and manufacturing rights ($112,837) would be treated as nonamortizable assets, but expenditures for development ($568,569) would be amortized. In addition, Roustabout proposed to amortize property, plant, and equipment with a cost of $313,523 over an eight-year period beginning with production. Petitioner and the principals in 36 Roustabout also assumed the Government loans could and would be refinanced in a short period to provide capital for expansion and to pay off the advances by stockholders. The cash flow chart was closely tied to a "Market Analysis" for the Trivan made by Roustabout's sales manager, who had 20 years experience in sales work in the automotive industry. The "Market Analysis" emphasized several factors - chief among them was the successful marketing of a lighter three-wheel vehicle (with the third wheel in the front, as contrasted to Trivan's third wheel in the rear) primarily as golf carts and Post Office delivery trucks. Other factors included the potentially large industrial and retail market. At this time a modest advertising program *299 had been in effect and foreign as well as domestic interest had been exhibited in marketing Trivans. However, no effort had been made to obtain dealer commitments since the Trivan was not yet in production, and Roustabout's management had concluded "that signing dealers up for any considerable length of time prior to availability of saleable units would be a mistake." Between August 30, 1962, and February 12, 1963, Roustabout had issued 493,920 additional shares of capital stock at $1 per share to bring the total of its issued shares to 500,000. Thereafter it issued no more shares. After the 500,000 shares were issued, Roustabout's capital stock, as of February 12, 1963, was owned as follows: Number of
Stockholder
Shares
Bazley and related interests
274,790
Alstate-Schuykill
108,000
Steve Comisac
1,000
Joseph L. Maguire
1,500
Richard Maguire
500
Evelyn Maguire
500
William or Judith Mahall
500
Joseph or Mary Repach
500
Fifty persons unrelated to Baz- ley or Maguire families
112,710
On March 28, 1963, in a complex series of interrelated transactions, Roustabout purchased the Frackville factory from GPIDC for $440,000. Roustabout borrowed $418,000 *300 of the purchase price, and also borrowed $380,000 for machinery and tooling. Of the amount borrowed, $518,000 was obtained from SBA and ARA, $188,000 from the Authority, $60,000 from the Schuylkill Trust Company, and $32,000 from GPIDC. On March 21, 1963, SBA had transmitted two authorizations (approved February 11, 1963) to the Schuylkill Trust Company. SBA had authorized a sevenyear $220,000 loan secured by a first lien on the land and building in that amount; ARA had authorized a seven-year loan of $160,000 secured in that amount by a first lien on Roustabout's machinery, equipment, furniture, and fixtures. Also on February 11, 1963, ARA approved authorization of a 20-year loan of $198,000, which on March 27, 1963, was amended to make Roustabout the borrower. [2] This last loan was secured by a second lien in the amount of $62,000 and a fourth lien in the amount of $136,000 on the land and building. The Authority obtained a third lien in the full amount of its loan ($188,000), and GPIDC obtained a fifth lien in the amount of $32,000. *301 Both of the ARA and SBA authorizations for seven-year loans required that $250,000 of new money (of which $108,000 already had been obtained) be put into Roustabout either "as equity capital or on loan subject to standby agreement" to be used solely for working capital. On April 2, 1963, these authorizations were amended to provide that the new money would consist of loans subject to a seven-year standby agreement in the form of Roustabout's indebtedness of $100,000 to petitioner and $150,000 to J. Robert Bazely. The March 27, 1963, amendment of the 20-year ARA $198,000 loan, changing the borrower to Roustabout instead of GPIDC, also required that the terms and conditions of the seven-year loans would apply to this 20-year loan. Standby agreements covering the above arrangements were executed by petitioner and J. Robert Bazley on March 28, 1963. A standby agreement was also executed by GPIDC and submitted to SBA subordinating its $32,000 loan to the loans made by SBA and ARA. It was petitioner's and J. Robert Bazley's decision to put the $250,000 of new money into Roustabout in the form of loans which were made subject to standby agreements executed on March 28, 1963, not the decision *302 of SBA or ARA. SBA approved their decision, as reflected in the above amendments. Petitioner and J. Robert Bazley were under no legal obligation to advance the $250,000 of new 37 money to Roustabout. Charles Payne, the developer of the three-wheel vehicle, was entitled to royalties on Trivan sales. Consistent with an SBA requirement, he agreed to defer his royalties for a period of two years. Payne was not a shareholder in Roustabout. Most of the loans called for monthly interest payments for the first six months, and thereafter monthly payments of interest and principal until the loans would be repaid. The loans required aggregate payments of about $3,600 per month for the first six months, and aggregate payments of about $7,800 per month thereafter. Of the loans, $380,000 was to be paid off by monthly installments in seven years, and $386,000 was to be paid off by monthly installments in 20 years. The loan of $32,000 from the GPIDC did not require installment payments of principal until after all the other mortgage loans had been repaid. On March 31, 1963, Roustabout had capital stock outstanding of $5000,000, shareholder advances in the form of loans aggregating $395,000, *303 total liabilities (including trade accounts and accrued taxes and expenses) of $1,648,294. Its deficit, composed of general and administrative expenses and amortized organization expense, was $105,803. The loan specialist employed by SBA, who reviewed the quality of the proposed loans to be made to Roustabout by SBA and ARA and assembled the facts for the agency to arrive at a final decision, stated in a letter written on April 2, 1963, four days after closing: "I am greatly impressed with Roustabout's prospects. I sincerely hope their success is in large measure." The Deputy Administrator of the ARA in a letter to Roustabout's president dated July 30, 1964, concurred in the optimism expressed by the SBA loan specialist. After numerous unexpected delays, including some required by changes in design, production of the Trivan began in late February or early March 1963. Roustabout completed the assembly of about 150 units of which only about 80 were sold. No Trivans were produced after June 29, 1963. At Roustabout's board of directors meeting of April 25, 1963, it was reported that dealer contacts were disappointing and that the dealers did not seem ready to accept the three-wheel *304 vehicle. More than 600 dealers had been contacted, but only one had signed a contract. On May 23, 1963, the board of directors considered Roustabout to be in a critical condition and so advised ARA, SBA, and GPIDC. On May 31, 1963, the board resolved to send a letter to all creditors asking their indulgence for an additional 30 to 60-day period pending negotiations for a continuation of the company's business. The board also resolved that the business be continued with a small payroll and watchman's service for an additional week. On June 20, 1963, J. Robert Bazley advised Roustabout's board of directors that two companies which earlier had made inquiries regarding purchasing the company no longer were interested in such purchase. At that time Roustabout had cash of less than $2,000, and estimated it needed $21,000 to operate to the end of June. From late June to late September 1963, negotiations were conducted between Roustabout and Mack Trucks, Inc., to have the latter manufacture Trivan vehicles in the Roustabout facilities for sale to the country of Pakistan. These negotiations appeared to have some prospects for success and if successful, would have carried Roustabout through *305 the difficult problems of 1963. However, they failed because Mack Trucks was unable to consummate an agreement with Pakistan. On July 25, 1963, the Roustabout board of directors resolved to make initial offers to sell the stock of Roustabout, subject to shareholders' approval, for $0.25 per share plus the assumption of all liabilities. On November 12, 1963, Roustabout filed a petition in bankruptcy in the United States District Court for the Eastern District of Pennsylvania and was adjudicated bankrupt that day. The list of secured and unsecured creditors, part of the statement of affairs filed in the bankruptcy proceeding, listed secured claims in the amount of $874,762 and unsecured claims in the amount of $823,906.66. The claims of petitioner, J. Robert Bazley, Inc., and J. Robert Bazley were listed among the unsecured claims as loans made to Roustabout in the then respective amounts, with interest, of $107,400, $145,000, and $165,700. Also listed among the unsecured claims were additional claims by petitioner and J. Robert Bazley, Inc., in the respective amounts of $1,277.78 and $16,401.29. The balance of $388,127.59 was owed to various unrelated, unsecured creditors. *306 As a result of the liquidation of Roustabout, the following amounts were realized by its creditors: 38 Secured Creditors
Received
SBA and Schuylkill Tr. Co. on $220,000 loan
$220,000
ARA and Schuylkill Tr. Co. on $160,000 tool loan
103,000
ARA on its $198,000 loan
62,000
Authority on its $188,000 loan
178,000
GPIDC on its $32,000 loan
0
Unsecured Creditors
0
For the taxable year ended March 31, 1964, petitioner claimed a bad debt deduction under section 166 in the amount of $100,000 for "loans" made to Roustabout in 1963, which became worthless in the taxable year 1964. Petitioner claimed carrybacks of parts of these losses to the taxable years 1961 and 1962. Respondent disallowed the deductions, determining that the advances to Roustabout constituted equity capital rather than bona fide indebtedness. [3]
Ultimate Findings of Fact Petitioner's advances to Roustabout totaling $100,000 in January and February 1963 created true indebtedness rather than an equity interest. Opinion Respondent concedes *307 that petitioner suffered a loss in its fiscal year ended March 31, 1964, as a result of having advanced $100,000 to Roustabout in January and February 1963. The question is whether petitioner may deduct the $100,000 as a debt which became worthless within the taxable year under section 166(a)(1), [4] or whether petitioner is entitled only to a capital loss deduction. The answer depends upon whether petitioner's advances of funds created true indebtedness or constituted a capital contribution. Court decisions dealing with the question whether advances of funds create indebtedness or equity interests have articulated criteria which are helpful, if only as general guides, in reaching a decision. See e.g., Fin Hay Realty Co. v. United States, 398 F. 2d 694 (C.A. 3, 1968); O.H. Kruse Grain & Milling v. Commissioner, 279 F. 2d 123 (C.A. 9, 1960), affirming a Memorandum Opinion of this Court. However, no one factor or series of factors is determinative. John Kelley Co. v. Commissioner, 326 U.S. 521 (1946). *308 All the facts must be taken into account. Upon consideration of the relevant factors in the light of the record before us, we have concluded that petitioner's advances to Roustabout in January and February 1963, totaling $100,000, created indebtedness. The demand notes given by Roustabout to petitioner in consideration of the latter's advances of funds evidenced unconditional obligations to pay fixed sums, bore a fixed rate of interest unconditionally payable, and carried no voting rights. See Gilbert v. Commissioner, 248 F. 2d 399, 402 (C.A. 2, 1957). The liability of $100,000 to petitioner was shown on all of Roustabout's financial statements. Thus, the transaction had the formal attributes of the creation of indebtedness. While form is not determinative, it is a relevant factor entitled to some weight in deciding the true character of advances of funds. Charles E. Curry, 43 T.C. 667, 687 (1965). By January 16, 1963, when petitioner's board of directors authorized the $100,000 advance to Roustabout, all except $3,500 of a total of $500,000 in subscriptions to the stock of Roustabout had been paid. The remaining $3,500 was paid within the next month. *309 The total indebtedness of Roustabout to its shareholders, including the $100,000 here in dispute, never exceeded $395,000. Thus, Roustabout had substantial capital from sales of stock, and its indebtedness to its shareholders in relation to capital stock was not excessive. The circumstances in which the $100,000 was advanced to Roustabout convince us that petitioner's officers and directors expected repayment within a reasonable time. Preliminary work for the manufacture of the three-wheel motor vehicle, the Trivan, had been substantially completed. The capital outlays for development of plans had been made, tools and equipment had been acquired, and arrangements had been made for obtaining a plant. Roustabout had conducted rigorous tests on the Trivan and production was expected to start within a short time. Petitioner's $100,000 loan, along with the loans of $150,000 and $145,000 from the Bazley interests, were made in order to assist Roustabout in qualifying for loans from SBA, ARA, and GPIDC, 39 Government agencies which had made extensive studies of the prospects for the successful manufacture and sale of the Trivan. Funds were needed for the purchase of an inventory of *310 parts for the Trivan. Cash flow projections furnished to these agencies indicated that receipts would be sufficient to repay the Government loans, as well as petitioner's, within a reasonable time. See Jack Daniel Distillerty v. United States, 379 F. 2d 569 (Ct. Cl. 1967). Early repayments were expected to be aided by the amortization of investments which would free cash for repayment of the loans even if net income, as such, was not available for this purpose. See Liflans Corporation v. United States, 390 F. 2d 965 (Ct. Cl. 1968). Significantly, subsequent to petitioner's $100,000 advance, direct or guaranteed loans of $578,000 were obtained from the Government agencies. Quite obviously such loans would not have been made if objective studies had not indicated that the enterprise would succeed. The ultimate bankruptcy of Roustabout was apparently attributable to a failure to find a ready market for the Trivan. A brochure, dated January 3, 1963, stated that all sales of the Trivan were to be made through authorized dealers under practices established in the automotive industry. The price of the vehicle was to be in the range of $1,500 to $1,600; the anticipated *311 markets included military establishments, Government agencies, service industries, farms, airports, golf courses, and parks. The brochure further recited that a "modest advertising program" had "generated considerable interest in the TRIVAN" but that "[no] great effort has been made to sign up dealers since we have not been in production and it has been our considered opinion that signing dealers up for any considerable length of time prior to availability of saleable units would be a mistake." When the vehicle was finally placed in production in the spring of 1963, a concerted effort was then made to locate dealers but it failed. Contacts with over 500 potential dealers produced only one dealership contract. Despite prior indications to the contrary, Roustabout learned that potential dealers did not believe that a three-wheel vehicle of the Trivan design was saleable. With the aid of hindsight, we might conclude that the lack of a market for the Trivan and the errors in the cash flow charts should have been foreseeable, or that firm arrangements should have been made earlier for dealerships to develop a market. But if these were errors of judgment, petitioner was not alone in *312 making them, for the Government agencies made their loans even after petitioner had advanced its $100,000. From the record before us, we conclude that Roustabout's untimely demise was not foreseen either when petitioner advanced its funds or when it executed the standby agreements. Respondent lays heavy emphasis on the standby agreements executed by petitioner to assist in obtaining the loans from the Government agencies, arguing that petitioner thereby subordinated its claim and placed its funds at the risk of the business. We agree that subordination of a claim to all indebtedness of a corporation weighs heavily toward an equity participation and against the existence of a bona fide debtor-creditor relationship. The standby agreements, however, were not such a subordination. Their effect was merely to postpone payments of principal and interest on petitioner's $100,000 note and Bazley's $150,000 note until SBA and ARA were paid. They did not deny petitioner the right to participate as a general creditor in liquidation proceeds. While the standby agreements gave a preference to SBA and ARA, Roustabout's debts to those agencies were secured by mortgages. Thus, the preference granted *313 by the standby agreements, in reality, already was present in the lien provisions. Cf. Tomlinson v. 1661 Corporation, 377 F. 2d 291, 298 (C.A. 5, 1967); Jack Daniel Distillery v. United States, supra at 582. While upon liquidation of Roustabout the Government agencies received $563,000 on their secured claims and the unsecured general creditors, including petitioner, received nothing, petitioner's right to share with these other general creditors was not impaired by the standby agreements. True, the standby agreements ran for 20 years as to $198,000 and seven years for the balance of the Government loans. But cash flow projections, as noted above, indicated that repayments would be made within a much shorter time. Petitioner's decisions to loan the $100,000 and later to execute the standby agreements were made in the light of then existing conditions, not the conditions as they finally developed. We note that petitioner did not have cash for the loan but borrowed it, according to its minutes of January 16, 1963, for a "temporary" loan. We believe that 40 petitioner made the $100,000 loan, relying on business judgments, shared by its board of directors and the Government *314 agencies, that repayment would be made within a reasonable time. Respondent finds some correlation between petitioner's percentage of stock ownership (21.6 percent) and its percentage of the total shareholder loans (25.3 percent). But any such correlation appears to have been a coincidence. True, the Bazley group, the moving force behind Roustabout from the beginning, advanced $295,000, which represented nearly 75 percent of the total shareholder debt. But there appears to have been no relationship between petitioner's advance of $100,000 and the $145,000 advanced by J. Robert Bazley, Inc., between November 16, 1962, and March 21, 1963. And none of the 50 unrelated shareholders owning about 22.5 percent of the stock made loans. In summary, from the record it appears that in January and February 1963, when petitioner advanced the $100,000, all the interested parties were optimistic as to the success of Roustabout - petitioner, the Government lending institutions, Roustabout, and unrelated creditors of Roustabout. Both petitioner and Roustabout expected at the time of the transaction that the loan could be repaid within a reasonable time. Petitioner's and Roustabout's intention *315 was to create a debtor-creditor relationship, and the transaction was so documented. Petitioner was aware that rigorous tests on Roustabout's product - the Trivan - had been conducted and, in making its decision to advance the funds, petitioner relied on market analyses, cash flow charts, and other data believed to be reliable. That petitioner's judgment as to the future of the Roustabout venture proved to be wrong does not show that petitioner was making a capital contribution. Accordingly, we hold that petitioner's advances of $100,000 to Roustabout created bona fide indebtedness. Since the parties agree that the claim for repayment of the advances became worthless in petitioner's fiscal year 1964, petitioner is entitled to the disputed bad debt deduction under section 166(a)(1) in that year. Decision will be entered under Rule 50. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted.↩
2. The difference between the total SBA and ARA loans authorized of $578,000 and the above reference to $518,000 obtained from SBA and ARA is explained by the fact that the $60,000 obtained from the Schuylkill Trust Company was participated in by ARA, SBA, and the Trust Company.↩
3. Under respondent's position only a capital loss would be allowable. Petitioner had no capital gains during the years in question.↩
4. SEC. 166. BAD DEBTS. (a) General Rule. - (1) Wholly worthless debts. - There shall be allowed as a deduction any debt which becomes worthless within the taxable year.↩