POST CORPORATION

v.

The UNITED STATES.

No. 74–78.

United States Court of Claims.

Jan. 28, 1981.

Roger C. Minahan, Milwaukee, Wis., attorney of record, for plaintiff. Thomas J. Phillips, Milwaukee, Wis., of counsel.

Jay G. Philpott, Jr., Washington, D. C., with whom was Asst. Atty. Gen. M. Carr Ferguson, Washington, D. C., for defendant.

Before NICHOLS, KASHIWA and SMITH, Judges.

OPINION

PER CURIAM:

This case comes before the court on plaintiff's motion, filed November 13, 1980, and defendant's motion, filed November 14, 1980, both requesting that the court adopt the recommended decision of Trial Judge Robert J. Yock, filed September 26, 1980, pursuant to Rule 134(h), as the basis for its judgment in this case. Upon consideration thereof, without oral argument, since the court agrees with the trial judge's recommended decision, as hereinafter set forth*, it hereby grants the motions of the parties and affirms and adopts the recommended decision as the basis for its judgment in this case. Therefore, judgment is entered for plaintiff as set forth in the following conclusion of law with the amount of recovery to be determined pursuant to Rule 131(c).

OPINION OF TRIAL JUDGE

YOCK, *Trial Judge*: This is an action by the plaintiff, Post Corporation to recover from the United States of America (herein referred to as "defendant") federal income taxes for the calendar years 1969 and 1970 in the total amount of $56,577.69 plus interest paid thereon in the total amount of $14,583.72, together with interest on the sum thereof as provided by law. These sums were alleged to have been erroneously and illegally assessed against and collected from Post by the Internal Revenue Service as a result of an allocation of gross income in the form of interest to Post from its wholly-owned subsidiary corporation, Crandon Corporation, a Delaware corporation (formerly called "Cameron General Corporation" and herein referred to as "Crandon"). Jurisdiction is based on 28 U.S.C. § 1491 (1976).

The allegedly erroneous income allocation was made pursuant to 26 U.S.C. § 482 (1954), as amended, which states:

In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organ-

---

* Although the court adopted the trial judge's separate findings of fact, which are set forth in his report, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

ized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades or businesses.

The defendant has not charged that the allocation at issue is necessary to prevent the evasion of taxes, but has confined its argument to the allegation that an allocation of interest income to the Post Corporation is necessary to clearly reflect the income of Crandon and Post during 1969 and 1970. The tax significance of this interest allocation to Post lies in the fact that Crandon reported no income in 1969 and 1970. The adjustment allocates to Post interest income the payment of which cannot be deducted by Crandon due to its "loss" or no income status, although such a deduction officially is "deemed" to have been made.

Among the regulations implementing section 482, Treas.Reg. § 1.482–2(a)(1) in force at all times pertinent stated:

Determination of taxable income in specific situations.—(a) Loans or advances—(1) in general. Where one member of a group of controlled entities makes a loan or advance directly or indirectly to, or otherwise becomes a creditor of, another member of such group, and charges no interest, or charges interest at a rate which is not equal to an arm's length rate as defined in subparagraph (2) of this paragraph, the district director may make appropriate allocations to reflect an arm's length interest rate for the use of such loan or advance.

■ However, subparagraph (a)(3) of section 1.482–2 clarifies that "[s]ubparagraph (1) of this paragraph does not apply to alleged indebtedness which was in fact a contribution to capital or a distribution by a corporation with respect to its shares." Therefore, the threshold issue before the court is whether Post's monetary contributions to Crandon constituted debt or equity. This issue is dispositive of the case as, for the reasons discussed herein, the court holds that these transactions were capital contributions and the allocation of interest income to Post accordingly was improper.

*Facts*

Plaintiff is a Wisconsin corporation with its principal place of business located in Appleton, Wisconsin. During the years in issue, plaintiff was an operating company which, along with a number of wholly-owned subsidiaries, was engaged principally in the business of publishing newspapers and operating television and radio stations.

Although Post had no previous experience in the insurance business, it considered that the acquisition of All-Star Insurance Corporation, a Wisconsin stock insurance corporation (herein referred to as "All-Star") would be a good business opportunity. Thus, on May 23, 1969, plaintiff purchased an indirect 54.9 percent controlling interest in All-Star through the purchase of all of the issued and outstanding stock of Crandon, which at the time held 110,112 shares out of the 200,209 issued and outstanding shares of stock of All-Star. Besides the All-Star shares, Crandon's only other assets on May 23, 1969, were cash in the amount of $5,667.54, capitalized organization expenditures in the amount of $1,447.98 and the stock of Commercial Insurance Service of Wisconsin, Inc., a captive insurance agency employed to market an insignificant portion of All-Star's business which then had a book value of $500. Numerous unrelated persons owned the remaining 90,097 issued and outstanding shares of All-Star.

The sole reason for plaintiff's purchase of the Crandon stock was the acquisition of the 54.9 percent controlling interest in All-Star. Because the Anglo-American Investment Company, the seller of the Crandon stock, would not permit Crandon to sell the All-Star stock directly, plaintiff had to purchase the Crandon stock in order to acquire the controlling interest in All-Star.

When plaintiff purchased the Crandon stock, it planned to acquire the 90,097 remaining shares of All-Star and decided to use Crandon as a vehicle to accomplish this limited purpose. It was always plaintiff's intention and plan, prior to and after May 23, 1969, to liquidate Crandon when as many of the 90,097 remaining shares of All-Star as possible had been acquired.

Plaintiff paid a total purchase price of $1,105,667.54 for the stock of Crandon. As part of this price, plaintiff was required under the purchase agreement with Anglo-American to discharge the liabilities of Crandon at the closing which amounted to $727,091.07. The balance of the total purchase price in the amount of $378,576.47 was to be paid directly to Anglo-American. Plaintiff paid the total purchase price by causing the First Wisconsin National Bank of Milwaukee (herein referred to as "First Wisconsin") to issue cashier's checks drawn on plaintiff's account with First Wisconsin to Crandon's creditors totalling $717,091.07 and to Anglo-American in the amount of $378,576.47. Plaintiff paid one creditor of Crandon the amount of $10,000 by plaintiff's own check, bringing the total amount of Crandon liabilities which were discharged to $727,091.07.

Plaintiff financed a portion of the total purchase price for the Crandon stock by obtaining a $700,000 loan from First Wisconsin on May 23, 1969, the proceeds of which were deposited in plaintiff's account with that bank and were disbursed in payment for the Crandon stock.

On August 4, 1969, Post started the second phase of its intended plan to acquire All-Star and as many of its outstanding shares as possible. Beginning on that date, Crandon made a tender offer for 50,062 or more shares of the remaining 90,097 shares of All-Star owned by the numerous unrelated persons at $9.50 per share. As a result thereof, Crandon by December 31, 1970, had acquired 84,817 additional shares of All-Star which together with Crandon's prior stockholdings in All-Star represented approximately 97.4 percent of the issued and outstanding stock of All-Star. The total cost for the 84,817 additional shares of All-Star was $829,242, including broker commissions and related expenses.

Plaintiff, between September 4, 1969 and December 31, 1970, provided all $829,242 of the funds which were paid to buy the additional All-Star stock. This was necessary in order to follow the purchase/liquidation plan already described, as Crandon had no income or funds available to purchase the All-Star stock directly.

Plaintiff financed $750,000 of the $829,242 by obtaining additional loans from First Wisconsin in September of 1969. The proceeds of these loans in the amount of $750,000 were deposited by Post for the benefit of Crandon with first Wisconsin although the account was in plaintiff's name. The bank acted as the depository in connection with the tender offer for the All-Star shares, and disbursed the funds from plaintiff's account as necessary to pay for the All-Star shares acquired in the name of Crandon.

When Crandon was acquired on May 23, 1969, Mr. David Nelson the chief financial officer of plaintiff as its treasurer, directed in writing his subordinate, Mr. Lawrence DeCoster, who had responsibility for the accounting functions of plaintiff and its subsidiaries, to record the amount of $1,105,667.54, which was the total purchase price paid to acquire Crandon, on the books of plaintiff as a capital investment in the stock of Crandon. Mr. Nelson contemplated that all subsequent amounts which plaintiff paid for the benefit of Crandon to acquire All-Star stock would be treated similarly as additional contributed capital (capital investment) in Crandon. In May of 1969, Mr. DeCoster opened plaintiff's account No. 1733 entitled "Cameron General Corporation" and recorded the $1,105,667.54 as capital investment pursuant to Mr. Nelson's instructions.

At the time plaintiff acquired Crandon, Crandon's books showed liabilities to various creditors in the amount of $727,091.07, and after plaintiff discharged these liabilities as required, Mr. DeCoster left the $727,091.07 amount in a liability account of

Crandon renaming it "Notes Payable—Post Corporation." No actual notes payable or notes receivable were executed between Post and Crandon in conjunction with the transactions involved in the May 23, 1969, purchase of Crandon. This entry was made solely to conform Crandon's accounts under its new ownership to the character they had assumed while Crandon was the property of Anglo-American, while simultaneously indicating the source of payment of these prior debts.

Crandon initially had a fiscal year ending June 30 which was changed to the calendar year after June 30, 1969, to conform with plaintiff's fiscal year. Mr. DeCoster closed Crandon's books for the year ended June 30, 1969, reflecting the $727,091.07 in the notes payable account although plaintiff's books at the time reflected this amount as a capital investment in the stock of Crandon. Subsequently, Mr. DeCoster continued to enter substantially all the advances ($829,-242) plaintiff made to Crandon for the purpose of acquiring the additional remaining All-Star shares in Crandon's notes payable account.

In September 1969, Mr. DeCoster opened plaintiff's account No. 1733.1 entitled "Cameron General—Notes Receivable" to correspond with the Crandon notes payable account. On December 31, 1969, Mr. DeCoster, without consulting Mr. Nelson, reduced plaintiff's account No. 1733 (entitled Cameron General Corporation) by $727,-091.07 and increased plaintiff's account No. 1733.1 (entitled Cameron General—Notes Receivable) by the same amount thereby transferring $727,091.07 of what was originally booked as equity to a receivable account. Mr. DeCoster testified that he did this because Crandon's books had been closed on June 30, 1969, and he wanted to conform plaintiff's books, which had not yet been closed, to the entries which were on the Crandon books. There was also inconsistent treatment by Mr. DeCoster on some of the items subsequently entered in plaintiff's accounts No. 1733 and 1733.1 during 1970 in that some entries which reflected payments by plaintiff to acquire All-Star stock in the name of Crandon were entered

in one account (indicating investment) and some in the other (indicating debt).

Crandon's books and financial statements for its fiscal years ended June 30, 1969, December 31, 1969 and December 31, 1970 recorded the amount of $727,091.07, which plaintiff paid to discharge Crandon's liabilities as part of the investment agreement on May 23, 1969, and the subsequent advances plaintiff made to Crandon in the total amount of $829,242 for the benefit of Crandon in acquiring the additional 84,817 shares of All-Star stock in an account entitled Notes Payable—Post Corporation as follows:

| | |
|---|---|
| 6–30–69 | $ 727,091.07 |
| 12–31–69 | 1,541,788.67 |
| 12–31–70 | 1,556,333.07. |

Plaintiff's books as of June 30, 1969, and for its fiscal year ended December 31, 1969 and immediately before the end of its fiscal year ended December 31, 1970, recorded these amounts in an account entitled Notes Receivable—Crandon Corporation as follows:

| | |
|---|---|
| 6–30–69 | $ − 0 − |
| 12–31–69 | 1,541,788.67 |
| 12–31–70 | 1,556,333.07. |

No actual notes payable or notes receivable were ever executed between Crandon and plaintiff with respect to either the initial $727,091.07 purchase amount or the $829,242 subsequently advanced to Crandon to acquire All-Star stock.

The Schedule L (balance sheet) to Crandon's federal income tax returns for its years ended June 30, 1969, December 31, 1969 and December 31, 1970, were prepared from the above-mentioned accounts and contained the amounts in Crandon's notes payable account under the heading "Loans from Stockholders." Hence, on Schedule L of its federal income tax return (Form 1120) for the taxable year ending June 30, 1969, Crandon listed as an asset an investment of $860,755 in All-Star, and listed as a liability ("Loans from Stockholders") the amount of $727,091. On Schedule L of its Form 1120 for the taxable year ending December 31, 1969, Crandon listed as an asset

an investment of $1,673,707 in All-Star, and listed as a liability ("Loans from Stockholders") the amount of $1,541,789. On Schedule L of its Form 1120 for the taxable year ending December 31, 1970, Crandon listed as an asset an investment of $1,944,178 in All-Star, and listed as a liability ("Loans from Stockholders") the amount of $1,556,333.

The fact that the notes receivable and notes payable entries on plaintiff's and Crandon's books did not reflect an investment in the capital stock of Crandon or contributions to the capital of Crandon as was intended was discussed by Mr. Nelson and Mr. DeCoster sometime in mid-March of 1970 when Post's federal income tax returns were prepared for the year ending December 31, 1969. It was decided at that time not to correct the books of plaintiff and Crandon because plaintiff was going to liquidate Crandon. The two officers decided that there was no difference for plaintiff's financial accounting purposes since the two accounts of plaintiff (account No. 1733 and account No. 1733.1) were grouped together as "Investment in and Advances to Unconsolidated Subsidiaries" on plaintiff's published financial statements, and the entries were believed to have no effect for tax purposes.

Plaintiff always considered that the borrowed funds, which it had paid for the benefit of Crandon totalling $1,556,333.07 during the period May 23, 1969 through December 31, 1970, were an investment in the stock of or contributions to the capital of Crandon and not indebtedness of Crandon to plaintiff, despite the entries on the books of plaintiff and Crandon. Plaintiff never charged or received from Crandon any interest on these amounts.

On December 31, 1970, Crandon was liquidated and dissolved as planned pursuant to section 332 and section 334(b)(2) of the Internal Revenue Code. At all times since May 23, 1969 and up to the liquidation of Crandon, plaintiff exercised complete managerial control over Crandon by virtue of its 100 percent ownership of the Crandon stock. When Crandon was liquidated, plaintiff, consistent with its intention to treat the funds it paid for the benefit of Crandon as capital contributions and not as loans or debts, characterized these amounts as equity accounts on its books, and treated them as such for federal income tax purposes.

Plaintiff charged and collected interest from all of its subsidiaries to which it had advances on its books in 1969 and 1970, except for Crandon and Ken-Com, Inc., both of which were liquidated as of December 31, 1970, and reported no taxable income during 1969 and 1970. It was Post's general policy to charge its subsidiaries interest on their indebtedness to Post regardless of whether the subsidiaries reported net income or net loss. Both Mr. Nelson and Mr. DeCoster testified that the failure to charge Ken-Com interest was strictly due to an accounting oversight, and that Post in subsequent years had charged interest on advances to its other loss subsidiaries.

There was never any agreement between plaintiff and Crandon, written or otherwise, with respect to repayment, a maturity date, a rate or payment of interest, collateral or plaintiff's rights upon Crandon's default with regard to any of the funds provided by plaintiff for the benefit of Crandon. No promissory notes or other written evidence of indebtedness were given by Crandon to plaintiff for the money provided.

Crandon could not on its own credit have obtained any loans from a commercial lender such as First Wisconsin in order to acquire the shares of All-Star because Crandon had no cash flow and the only security for such loans would have been the All-Star shares, which were not considered to be valuable in liquidation due to the priority of policyholder claims. While First Wisconsin would have loaned money to Crandon on the guarantee of Post, it would have relied solely on the credit of Post and would have looked to Post for repayment. Assuming that the funds plaintiff provided for the benefit of Crandon were debt, Crandon would have had an extremely high debt-equity ratio of 5.14 to 1 as of May 23, 1969, and 11.04 to 1 as of December 31, 1970.

At all times during the periods in issue herein, Crandon was a nonoperating company engaged in no income-producing activity or business. Crandon's only activity was the acquisition and temporary holding of the stock of All-Star. Crandon had no gross income for its years ended June 30, 1969, December 31, 1969 and December 31, 1970. Thus, Crandon never had any funds with which to repay any of the $1,556,333.07 provided to it by plaintiff or to pay interest thereon.

Because Crandon was a holding company, and engaged in no income-producing activity or business, its only potential source of income would have been dividends from All-Star assuming All-Star was able to pay dividends. As a result, plaintiff's risks associated with the funds it provided for the benefit of Crandon depended on the success and earnings of All-Star as a going concern, and would be the same whether Post had acquired the stock of All-Star directly without the intervention of Crandon or indirectly with the intervention of Crandon.

All-Star was a property and casualty insurer that specialized in surplus lines insurance, which tends to be the riskiest type of insurance written. During 1969 and 1970, All-Star was unable to pay any dividends to its shareholders because it had an accumulated earned surplus deficit in each of those years and it would have been illegal under the Wisconsin Business Corporation Law to pay such dividends. Mr. Stanley DuRose, the Commissioner of Insurance of Wisconsin during 1969 and 1970, testified that not only would the payments of any dividends by All-Star during 1969 and 1970 have been illegal because of All-Star's accumulated earned surplus deficit, but that the Wisconsin insurance department would have ordered the company to make good the surplus.

Aside from the illegality of any dividend payment by All-Star, All-Star was financially unable to pay any dividends to its shareholders during 1969 and 1970 due to the necessity of increasing its amount of capital and surplus in order to sufficiently fund the insurance risks resulting from the increased business it was transacting. Because of this necessity, plaintiff was required in 1971 and 1973 to contribute approximately $2,250,000 to the capital of All-Star.

It was never anticipated nor could it be expected that Crandon at any time would ever have any funds with which to make payments of interest or to repay any of the funds provided by plaintiff for Crandon's benefit. During the tax years at issue, Crandon had no source of income, and plaintiff and Crandon did not anticipate or expect that Crandon would realize any income from any source whatsoever.

Following an audit of plaintiff's returns, the IRS determined that because Post controlled Crandon and charged no interest for the amounts totalling $1,556,333.07, which it expended for Crandon's benefit, that an arm's-length allocation of 5 percent per annum interest on the monthly balances of plaintiff's account No. 1733.1 from Crandon should be included in plaintiff's gross income for 1969 and 1970 in order to clearly reflect Post's income as provided under section 482 of the Code. Specifically, the IRS allocated interest income to Post of $35,076.99 for 1969 and $77,351.11 for 1970. An appropriate correlative adjustment to Crandon (allowance of an interest expense deduction) was deemed to have been made, although it had no effect on Crandon's income tax liability for any pending taxable year as Crandon had reported no income in 1969 and 1970.

Plaintiff paid the tax assessed and the interest deficiencies attributable to these allocations, and proceeded to file timely claims for refund, no part of which has been repaid. It timely filed the present suit for refund.

*Discussion*

As regulation 1.482–2(a)(3) provides that no reallocation of interest income may be made to a parent corporation under section 482 of the Code, if the alleged indebtedness was in fact a contribution of capital to the subsidiary, this issue must be decided before any other aspect of the case can be con-

sidered. This threshold issue is, however, dispositive of the case since the court is compelled under the facts to conclude that the two essential transactions in question did in fact represent Post's (1) initial capital investment in the stock of Crandon and (2) subsequent contributions of plaintiff's capital in the form of advances to Crandon for the purpose of acquiring the remaining outstanding All-Star stock, for its own benefit.

The characterization of a transaction as debt or equity is not a clear cut task as no single factor or controlling test distinguishes one from the other. *John Kelley Co. v. Commissioner*, 326 U.S. 521, 530, 66 S.Ct. 299, 304, 90 L.Ed. 278 (1946). On the contrary, this area of the law is one in which it can perhaps most truly be said that differences in degree mature into differences in kind. A resolution of the question of "debt or equity" requires the evaluation of many factors, and, of necessity, must be made on a case by case basis. As stated in *American Processing & Sales Co. v. United States*, 178 Ct.Cl. 353, 362–63, 371 F.2d 842, 848 (1967):

> There is no dearth of cases in this province of tax law. So large is their number and disparate their facts, that for every parallel found, a qualification hides in the thicket. At most they offer tentative clues as to what is debt and what is equity for tax purposes; but in the final analysis each case must rest and be decided upon its own unique factual flavor, dissimilar from all others, for the intention to create a debt is a compound of many diverse external elements pointing in the end to what is essentially a subjective conclusion.

Traditionally, courts have analyzed as many as 16 separate factors in determining the nature of shareholders' financial contributions. *See Fin Hay Realty Co. v. United States*, 398 F.2d 694, 696 (3d Cir. 1968). These include:

(1) The name given the instruments;

(2) The intent of the parties as corroborated by surrounding facts;

(3) The ratio of debt to equity in the corporation's financial structure;

(4) Presence or absence of a reasonable expectation of repayment regardless of the success of the venture;

(5) The substantial economic reality of the transaction;

(6) The maintenance by shareholders of loans directly proportional to their stockholdings;

(7) Complete identity of interest between the parent and the subsidiary;

(8) Inability of the subsidiary to secure the same loan from an outside lender at comparable terms;

(9) Use of the loans to acquire capital assets;

(10) Timing of the advance with respect to formation of the subsidiary;

(11) Presence or absence of a fixed maturity date;

(12) The degree to which the parent has attempted to enforce payment of the subsidiary's obligation;

(13) Status equal or inferior to that of regular corporate creditors;

(14) Participation in management;

(15) The provision of a fixed rate of interest;

(16) The presence or absence of a limitation that interest be paid only out of dividend money.

The preponderance of the cases in which these tests have been employed involved allegations by the IRS that a transaction the taxpayer had structured as debt and had attempted to deduct interest upon was in substance equity despite the form of the transaction. This predominant use of the tests, however, had not afflicted them with any bias that prohibits their application to the debt or equity issue in the reallocation of income context of the case at hand. Moreover, many of these tests have been incorporated and elaborated in the long-

awaited regulations[1] recently proposed under I.R.C. § 385.[2]

In pursuing these various lines of inquiry, it must be remembered that "[w]hat the parties do is more important than what they say."[3] Thus, the name Post assigned to these two transactions is relevant, but not determinative, in elucidating the company's objective intent. Here, the funds advanced were reflected on the books and financial statements of Crandon as "Notes payable to Post." Similarly, on the books of Post they were recorded as "Notes receivable from Crandon." The funds were also reflected on Crandon's Schedule L for the taxable years ending June 30, 1969, December 31, 1969, and December 31, 1970, as "Loans from Stockholders." However, these account labels were the sole indicia of debt attached to these transactions. *See Cuyuna Realty Co. v. United States*, 180 Ct.Cl. 879, 886, 382 F.2d 298, 302 (1967). No notes, certificates, or other instruments of indebtedness were ever drawn up between plaintiff and Crandon. As the transactions were thus never reduced to written agreements, there were no provisions regarding fixed maturity dates, the payment of fixed rates of interest, or collateral—all factors traditionally associated with the creation of debt. *Hudson v. United States*, U.S. Court of Claims, Trial Division, No. 24–72, 36 AFTR 2d 75–5814 (Feb. 15, 1974). (A stipulation dismissing this action pursuant to Rule 102(a)(1)(ii) was filed August 23, 1974). In addition, the allocation of funds to Crandon by Post was made without corporate action by the board of directors of Post aside from the board minutes authorizing the purchase of Crandon and the tender offer for All-Star stock to be made by Crandon.

Defendant attacks Post's attempt to characterize its two essential transactions as equity investments or capital contributions in the face of their balance sheet characterization as debt, by stating that once a taxpayer has organized his business affairs so as to minimize his taxes, he must accept all the tax consequences flowing from his choice. *Higgins v. Smith*, 308 U.S. 473, 60 S.Ct. 355, 84 L.Ed. 406 (1940); *Television Industries, Inc. v. Commissioner*, 284 F.2d 322 (2d Cir. 1960). Specifically, the Government says that the taxpayer is not allowed to borrow the Commissioner's weapon of "substance-over-form" to extricate himself from the unforeseen and undesirable consequences of the transactions he has personally devised. *Federal Bulk Carriers, Inc. v. Commissioner*, 558 F.2d 128 (2d Cir. 1977); *Coca-Cola Co. v. Commissioner*, 369 F.2d 913 (8th Cir. 1966). While the principle the Government contends for is a sound one, its application is inappropriate in the instant circumstances as Post never attempted to structure these transactions as loans. As stated above, the sole indicia of indebtedness associated .with the transactions were the bookkeeping entries as

1. 45 Fed.Reg. 18,957 (1980). The proposed rules were announced on March 24, 1980, subject to written comments mailed no later than June 23, 1980. The regulations are proposed to apply to interests in corporations created after December 31, 1980.

2. Section 385 reads as follows:

"Treatment of certain interests in corporations as stock or indebtedness

"(a) Authority to prescribe regulations.—The Secretary is authorized to prescribe such regulations as may be necessary or appropriate to determine whether an interest in a corporation is to be treated for purposes of this title as stock or indebtedness.

"(b) Factors.—The regulations prescribed under this section shall set forth factors which are to be taken into account in determining with respect to a particular factual situation whether a debtor-creditor relationship exists or a corporation-shareholder relationship exists.

The factors so set forth in the regulations may include among other factors:

"(1) whether there is a written unconditional promise to pay on demand or on a specified date a sum certain in money in return for an adequate consideration in money or money's worth, and to pay a fixed rate of interest,

"(2) whether there is subordination to or preference over any indebtedness of the corporation,

"(3) the ratio of debt to equity of the corporation,

"(4) whether there is convertibility into the stock of the corporation, and

"(5) the relationship between holdings of stock in the corporation and holdings of the interest in question."

3. *Wilbur Security Co. v. Comm'r*, 279 F.2d 657, 662 (9th Cir. 1960).

"Loans from Stockholders," "notes payable" and "notes receivable," and the tax forms above described.

At the trial, there was uncontradicted testimony by Messrs. Nelson and DeCoster that these bookkeeping entries were made contrary to official directions and were solely for the purpose of conforming Crandon's current accounts with their character prior to Post's purchase of the company. Although Mr. DeCoster acknowledged that corrective entries could have been made, these steps simply were not taken. Thus, with respect to the Government's argument that Post's own characterization of the transaction bars it from asserting their true substance, this case falls squarely within the qualification that the taxpayer may not be "unfairly and unalterably bound to his own inadvertent error in making a book-keeping entry." *Cornelius v. Commissioner*, 494 F.2d 465, 471 (5th Cir. 1974).

It is quite apparent that Mr. DeCoster did not apply the proper accounting treatment in recording the above-mentioned transactions.

Upon Crandon's acquisition, by liquidating the $727,091.07 of liabilities, plaintiff, as sole shareholder of Crandon, furnished Crandon "contributed capital" in the amount of the liabilities liquidated—$727,091.07. The paid in capital (contributed capital) should have been recorded in the capital accounts of Crandon and indicated on Crandon's balance sheet as of May 23, 1969 in the Stockholders Equity portion.

Furthermore, the subsequent advances made to Crandon by plaintiff for the purpose of acquiring the balance of the All-Star outstanding stock should have been recorded on Crandon's books as paid in capital, not as notes payable.

Plaintiff's officers' testimony as to the company's intent, although subjective, should not be ignored when consistent with the objective facts. *Patterson v. United States*, 198 Ct.Cl. 543, 553, 459 F.2d 487, 493 (1972). Among the objective economic factors which corroborate the plaintiff's subjective intent that these funds were to be contributions to capital are the timing of the transactions and the use to which the funds were put. Traditionally, the fact that an advance was made at the time of formation of a subsidiary and was used for the purchase of the subsidiary's original assets, indicates that the advance was in substance a contribution to capital. *Fin Hay Realty Co., supra.* While Post's initial advance was not made in conjunction with the formation of Crandon, it did constitute payment of the subsidiary's purchase price and represented the full extent of Post's investment in the subsidiary to that date. If this court were to hold that the $727,091.07 of borrowed funds Post expended to discharge Crandon's liabilities as part of the purchase of Crandon were a loan to the subsidiary, Post would be left in the anomalous position of possessing an equity interest in a mere third of its purchase price to the seller. Pursuant to the purchase agreement between Post and Anglo-American, $727,091.07 of the $1,100,000 base price of Crandon was expended to discharge the debts of Crandon that were outstanding at the time of closing. The remaining $372,908.93, plus $5,667.54 representing Crandon's cash on hand, was paid directly to Anglo-American. While this $378,576.47 total can perhaps be viewed as Anglo-American's net gain from the sale, the terms of the sale dictated by Anglo-American cannot justly be employed to limit plaintiff's equity interest to the same amount. Pursuant to the purchase agreement, Post was required to discharge Crandon's debts by direct payment to the creditors in order to discharge Anglo-American from having to pay as guarantor any of Crandon's outstanding liabilities. Had Anglo-American not insisted on this method of payment, the $727,091.07 would have been paid directly to Anglo-American. Moreover, this sum was originally recorded in Post's books as an equity interest in Crandon and was only later—and erroneously—reclassified as debt.

With respect to the use to which this initial "advance" was put, it is clear that its sole purpose was to acquire 100 percent ownership of the stock of Crandon, thereby achieving for Post a controlling interest in

All-Star. Similarly, the second "advance" was used by Crandon solely to acquire additional All-Star stock. Crandon never repaid these "advances" to Post, but, upon its liquidation, Crandon's shares in All-Star were transferred to Post.[4] The funds at issue were thus expended for the purpose of acquiring capital assets for Crandon and ultimately for Post. Both advances thus represented a long-term commitment dependent on the future value of All-Star. *See Affiliated Research, Inc. v. United States*, 173 Ct.Cl. 338, 342, 351 F.2d 646, 648 (1965). In this respect, the transactions were more in the nature of capital contributions than loans.

The fact that Post never attempted to collect repayment reinforces this conclusion. *See Liflans Corp. v. United States*, 182 Ct.Cl. 825, 834, 390 F.2d 965, 970 (1968). *See also, Cuyuna Realty Co., supra*, 180 Ct.Cl. at 885, 886, 390 F.2d at 301–02. Proposed regulation 1.385–7(c)[5] announced the IRS' prospective view on this issue:

> Nonpayment of interest—(1) *In general*. If—
>
> (i) The owner of an instrument is one of the principal shareholders of the issuing corporation,
>
> (ii) The corporation fails to pay all or part of the interest accrued on the instrument during a taxable year, and
>
> (iii) The owner of the instrument fails to pursue available remedies with the ordinary diligence of an independent creditor, then the instrument is treated as stock beginning on the first day of the taxable year in which the failure to pay occurs.

Clearly, this rule must be equally applicable where the principal shareholder's loan was not represented by an instrument and there was no provision for interest. It is strangely incongruous for the IRS to pursue in this case an argument that is the antithesis of its publicly announced prospective policies. Further, as noted in note 4, the transfer of the All-Star stock to Post on Crandon's liquidation was not cast as satisfaction of the subsidiary's indebtedness to the parent so that the carry-over basis rules of I.R.C. § 332(c) and Rev.Rul. 69–426 would apply.

Moreover, it is abundantly clear that no commercial lender would have provided Crandon these funds on the same terms. During 1969 and 1970, Crandon had very little cash of its own and no income. The only security Crandon could have provided for an outside loan would have been the All-Star shares. These, however, were not considered valuable in liquidation due to the priority of policyholders' claims. A commercial lender would have made loans to Crandon to acquire the All-Star shares if Post would have guaranteed the loans. But in such case, the lender would have relied solely on the credit of Post and would have looked to Post for repayment. In any event, no commercial lender would have consented to an advance that was not evidenced by a writing and contained no maturity date or terms for the repayment of principal and the payment of interest. Nor would such a lender have allowed such huge sums to remain outstanding for a year and a half without making any attempt to collect. The facts of *Post* thus fall in line among those cases where it was found that an unaffiliated lender would not have entered the same transaction on the same generous terms. *American Processing & Sales Co., supra*, 178 Ct.Cl. at 371, 371 F.2d at 854; *Hudson, supra* at 75–5816; *Joseph Lupowitz Sons, Inc. v. Commissioner*, 497 F.2d 862, 866 (3d Cir. 1974).

Clearly, no commercial lender would have considered that a transaction in the nature of Post's "advances" to Crandon provided a

---

4. In this connection, it is important to note that at the time of Crandon's liquidation, the "advances" made to Crandon were treated as contributions to capital. Specifically, Post's basis in the All-Star stock it received upon the liquidation was determined by reference to Post's cost of the Crandon stock. Had the payments Post made for the benefit of Crandon been considered debt of Crandon to Post, Post's basis in the All-Star stock would have been determined by reference to the basis of the All-Star stock in the hands of Crandon. Rev.Rul. 69–426, 1969–2 C.B. 48.

5. *See* note 1, *supra*.

reasonable expectation of repayment regardless of the success of the venture. *Liflans Corp., supra*, 182 Ct.Cl. at 834, 390 F.2d at 970. As a holding company, Crandon's sole source of potential income was dividends from the All-Star stock. However, during the 2 years at issue, All-Star was running an accumulated earned surplus deficit, which precluded it from legally paying any dividends. Moreover, All-Star's accelerating insurance business demanded capital formation and retention and not dividend payouts. As Crandon had no potential source of funds, cash flow[6] or income other than All-Star, neither Post nor any commercial lender could reasonably have expected that Crandon would have been able to repay principal or pay interest on any loan.

Additional objective factors reaffirm the conclusion that the transactions in issue were contributions to capital rather than debt. Among these is the debt-equity ratio of Crandon. Thin or inadequate capitalization was perhaps unwittingly introduced as a test of the economic reality of a purported debt by the Supreme Court's passing dictum in *John Kelley Co., supra*, where it stated:

> As material amounts of capital were invested in stock, we need not consider the effect of extreme situations such as nominal stock investments and an obviously excessive debt structure.[7]

Although courts have uniformly rejected any fixed ratio of debt to equity as a per se test of tax avoidance, recognizing instead that corporations in various industries and in different stages of development have legitimate needs for varying debt structures, thinness of capitalization has long been acknowledged as one test, to be used in conjunction with others, in evaluating the true character of a purported debt. *See Liflans Corp., supra*, 182 Ct.Cl. at 833, 390 F.2d at 969. Historically, thinness of capitalization has been most significant when found along with subordination to other creditors, and has been least significant where sufficient cash flow to service the alleged debt has been demonstrated. *See generally*, Plumb, *The Federal Income Tax Significance of Corporate Debt: A Critical Analysis and a Proposal*, 26 Tax L.Rev. 369, 507–19 (1971). Clearly the inadequate cash flow in this case strengthens the inference that thin capitalization suggests an equity investment.

Moreover, in enacting section 385 of the Code as part of the Tax Reform Act of 1969, Congress explicitly authorized the Treasury Department to include the debt-equity ratio as a factor in its regulations providing standards to distinguish debt from equity. The prospective regulations recently promulgated by the Treasury do employ a debt-equity test and, if applied to this case, would classify the advances as equity.[8] If Post's payments for the benefit of Crandon are treated as debts, the debt-equity ratio of Crandon would have been 5.14 to 1 as of May 23, 1969, and 11.04 to 1 as of December 31, 1969. With respect to these facts, new regulation 1.385–8—Nominal capital states:

> (a) *In general.* Any instruments are treated as stock if—
>
> (1) The debt-to-equity ratio of the issuing corporation (determined under § 1.385–3(c) at the end of the taxable year in which the instruments are issued) is greater than 10:1, and
>
> (2) Immediately after the instruments are issued, the debt-to-equity ratio of the issuing corporation, computed by using the fair market value of the corporation's

---

**6.** In this respect, it is important to note that John McClure a commercial banking official employed at First Wisconsin, testified that the most important consideration to a lender in making a term loan is the cash flow of the borrower.

**7.** 326 U.S. 521, 526, 66 S.Ct. 299, 302, 90 L.Ed. 278 (1946). The quoted statement is dictum as the Court held merely that two seemingly irrec-

oncilable decisions of the Tax Court, one recognizing debt and the other finding equity in alleged debts presenting substantially the same facts, were beyond the power of appellate correction under the then current standard of review.

**8.** *See* note 1, *supra.*

outstanding stock as the stockholders' equity, is greater than 10:1.

Under this test, only the second advance would qualify as stock because Crandon's debt-equity ratio would have been made to exceed 10 to 1 only upon its issuance, and would have remained at the same level (11.-04 to 1) through the end of the year.

The new regulations would not exempt the initial advance from recharacterization as equity, however, as that advance would fall under section 1.385–9—Certain unwritten obligations:

> (a) *Scope*—(1) *In general.* This section applies to any loan of money made to a corporation by one of its shareholders, unless all material terms and conditions of the loan are contained in a written document (or a set of related documents) enforceable under applicable nontax law.
>
> (2) *Exception.* This section does not apply to loans that are actually repaid within six months after the day they are made, but only to the extent that the outstanding balance of such loans does not exceed $25,000. For this purpose, a loan is not considered to be actually repaid if it is renewed or offset in any manner.
>
> (b) *Initial classification*—(1) *In general.* Except as provided in paragraph (b)(2) of this section, a loan to which this section applies is treated as a contribution to capital (as of the day the loan is made) for all purposes of the Internal Revenue Code.
>
> (2) *Exception.* A loan to which this section applies is treated as indebtedness if the debt-to-equity ratio of the debtor corporation (determined at the end of the taxable year in which the loan is made) is not greater than 1:1.

Clearly, both of Post's advances qualify as equity under this proposed test. Indeed, the Government's argument that Post's advances to Crandon should be found to be debt because Post's interest-bearing loans to its profit-making subsidiaries similarly were not reduced to writing falls of its own weight under this test. While this court does not find the evidence sufficient to make such a finding, the fact contended for would not yield the result the Government desires. Rather than declaring all such advances to be debt, the proposed regulations characterize any unwritten advance in excess of $25,000 to a subsidiary with a debt-equity ratio no greater than 1 to 1 (as of the end of the year in which the advance is made) as a contribution to capital.

With respect to the remaining objective tests, complete identity of interest existed between plaintiff and Crandon as plaintiff owned 100 percent of Crandon's stock. As a result of this identity of interest, plaintiff exercised complete managerial control over Crandon, although this participation in management was not a provision of any agreement associated with the advances.[9] Indeed all of the officers and directors of Crandon were officers of Post. And, as a corollary of Post's 100 percent ownership of Crandon, it can be said that Post's loans were directly proportional to its stockholdings.[10]

In view of the above discussion, it is determined that both of Post's advances for the benefit of Crandon: (1) for the purposes of discharging the liabilities of Crandon initially and (2) for acquiring the additional outstanding stock of All-Star were—in economic reality—investments in and contributions to the capital of Crandon.

---

**9.** Generally, creditors have no right to participate in the management of debtor corporations. Thus, where courts have found such management prerogatives to exist, especially when embodied in the writing establishing the terms of the loan, they have found this an indication that the purported debt was more in the nature of equity. *See* Plumb, *The Federal Income Tax Significance of Corporate Debt: A Critical Analysis and a Proposal*, 26 Tax L.Rev. 369, 447–50 (1971).

**10.** In general, advances by shareholders are more likely to be considered debt the less proportional they are to the shareholders' stockholdings. Although primarily of significance where several stockholders have extended loans to a closely-held corporation, the evidential value of proportionality is that it indicates the absence of intent to enforce repayment of the loan. *See Liflans Corp. v. United States*, 182 Ct.Cl. 825, 836, 390 F.2d 965, 971 (1968).

*Summary*

 When viewing debt vs. equity controversies such as this case entails, it is critical that a court concentrate on the essential nature of the transaction. In this case, the court finds the essential nature of this transaction to be a long-term investment in a new business and not a short-term indebtedness arrangement. Plaintiff, in this case, wanted to buy a new business. To that end, it put together a short-term purchase/liquidation plan that accomplished that goal. Although there were bookkeeping errors made along the way, the essential transaction goals remained intact and were accomplished. This court is convinced by the totality of the factual circumstances herein present that the advances made by Post to Crandon constituted capital contributions. The court's analysis of these facts contained herein comports with its prior holdings in *Liflans Corp., supra; Cuyuna Realty, supra;* and *Affiliated Research, Inc., supra.*

The allocation of interest income to Post from Crandon pursuant to I.R.C. § 482 is therefore held invalid. Plaintiff is entitled to a refund of the $56,577.69 tax and the interest thereon of $14,583.72 it has paid as a result of the interest allocation, together with interest on the sum of these amounts as provided by law. The exact amount of the recovery to be determined by the parties in accord with Rule 131(c)(2).

## CONCLUSION OF LAW

Upon the findings and the foregoing opinion, the court concludes that the allocation of interest income to Post from Crandon pursuant to I.R.C. § 482 is invalid. Plaintiff is therefore entitled to recover in refund $56,577.69 in tax and $14,583.73 in interest it has paid as a result of the invalid interest allocation, together with interest on the sum of these amounts as provided by law. Judgment is entered accordingly. The exact amount of recovery will be determined in further proceedings under Rule 131(c).